84 N.J. Super. 541 (1964)
202 A.2d 874
HARRISON JOHNSON, MARGARET WILBER AND LOCAL 1199, DRUG AND HOSPITAL EMPLOYEES UNION, PLAINTIFFS,
v.
CHRIST HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided July 27, 1964.
*543 Mr. Martin L. Greenberg for plaintiffs (Mr. Melvyn H. Bergstein, on the brief).
Mr. Thomas L. Morrissey for defendant (Messrs. Carpenter, Bennett & Morrissey, attorneys; Mr. Laurence Reich, on the brief).
MATTHEWS, J.S.C.
This is an action instituted by plaintiffs Harrison Johnson and Margaret Wilber (hereinafter sometimes referred to as individual plaintiffs) and Local *544 1199, Drug and Hospital Employees Union (hereinafter referred to as the Union) against defendant Christ Hospital, a nonprofit corporation of the State of New Jersey, operating a hospital in Jersey City. In the first and second counts of the complaint, the individual plaintiffs allege that on October 12, 1962 and October 18, 1962, respectively, they were discharged from their employment with defendant because of their membership in or activity on behalf of the Union, in violation of their rights under Art. I, par. 19 of the New Jersey Constitution of 1947.
The individual plaintiffs seek relief for this claimed wrong by way of reinstatement to their former jobs with back pay and interest, injunctive relief against future violations of their constitutional rights, and, in the second count, punitive damages.
In the third and fourth counts, the Union alleges that "on or about October 16, 1962 [it] represented and still represents a majority of the non-professional, non-medical employees of Christ Hospital; that on that date, it informed defendant of its said representation of defendant's employees * * * and requested that defendant meet and bargain collectively with it," which request was refused by defendant. This, the Union contends, constitutes a violation of its rights and those of the individual plaintiffs under Article I, paragraph 19 of our Constitution afore-mentioned.
For this claimed wrong, the Union seeks relief by way of a judgment ordering defendant to bargain collectively with it as representative of the nonprofessional, nonmedical employees of a hospital, and, in the fourth count, punitive damages.
Defendant has filed an answer which generally denies the allegations of plaintiffs' complaint.

I.
In limine, it is observed that there is no dispute over the jurisdiction of this court with respect to the questions here *545 involved. There is no federal pre-emption, since under the terms of the Labor Management Relations Act of 1947, employees of charitable hospitals are specifically exempt from its provisions. See 29 U.S.C.A. § 152 (2) (61 Stat. 137, 29 U.S.C. § 141 et seq.). Absent the assertion of federal jurisdiction in this area, state courts may entertain jurisdiction in such matters. Utah Valley Hospital v. Industrial Commission of Utah, 199 F.2d 6 (10 Cir. 1952); Cooper v. Nutley Sun Printing Co., Inc., 36 N.J. 189, 194 (1961).
It is equally well settled that neither the absence of labor legislation in this State, nor the disinclination of the Legislature to provide machinery or legislation for the control of intrastate labor matters can bar this court from the authority, as part of its general jurisdiction, to speak in actions dealing with these matters. Cooper v. Nutley Sun Printing Co., Inc., supra, at p. 195; Independent Dairy Workers, etc. v. Milk Drivers, &c., Local No. 680, 30 N.J. 173, 181 (1959).
Two questions relating to jurisdiction have been raised by defendant which merit consideration. The first deals with the applicability of Art. I, par. 19 of the Constitution of 1947 to private voluntary hospitals as employers. The second involves the status of the Union to maintain this action in its own right.

A.
Defendant contends that the framers of the Constitution of 1947 in formulating the statement of rights of employees in public and private employment as contained in Article I, paragraph 19 thereof, failed to consider the position of privately operated charitable institutions such as Christ Hospital. Examination of the minutes of the Constitutional Convention of 1947 fails to disclose therein any references to institutions such as defendant here. Defendant urges that privately operated voluntary hospitals should not be subject to the constitutional provision in question since, in reality, *546 they are daily discharging functions which are also being discharged by similar governmentally operated institutions. At best, defendant's arguments as to this point seek to establish that privately operated hospitals fall into a category which might be termed quasi-public. It does not appear, however, that the delegates to the Constitutional Convention even considered the category of hospital employees during their deliberations which led to the adoption of Article I, paragraph 19. The classifications established by the framers embrace public and private employees. While reference may be found in the minutes to employees of public utilities, no specific action was taken with respect to them because of the existence of N.J.S.A. 34:13B (L. 1946, c. 38) dealing with labor disputes in public utilities, enacted in 1946.[1] It was believed by the delegates that the provisions of Article XI, Section I, paragraph 3 of the proposed Constitution would continue the vitality of the Public Utility Labor Disputes Act, despite the adoption of the new Constitution.
With the exception of the references made to employees of public utilities, the minutes of the Proceedings of the Constitutional Convention of 1947 make it clear that the delegates in drafting and adopting Article I, paragraph 19 were chiefly concerned with a statement of the rights of two classes of employees: those in private employment and those in public employment. It is equally clear that the classification of public employees refers to governmental employees as opposed *547 to all others.[2] See I Proceedings of the N.J. Constitutional Convention of 1947, pp. 328, 655.
In Greisman v. Newcomb Hospital, 40 N.J. 389 (1963), a case involving the admissions to staff policies of a private voluntary hospital, wherein it was contended that Newcomb Hospital as a private rather than a public hospital might in its discretion exclude physicians from its medical staff, our Supreme Court observed:
"Broad judicial expressions may, of course, be found to the effect that hospitals such as Newcomb are private in nature and that their staff admission policies are entirely discretionary. [Citations omitted] They are private in the sense that they are nongovernmental, but they are hardly private in other senses." (at p. 396)
Christ Hospital is nongovernmental. Other than meeting the licensing requirements of the State, there is no control exercised over the administration of the hospital by any governmental agency. The hospital is operated by a council of 35 members who represent the general public. It is loosely affiliated with the Protestant Episcopal Church and, as a result, all the Episcopal clergy of Hudson County are automatically on its board. The hospital operates on funds which are derived *548 from the bills paid by patients who are admitted for treatment, from public drives conducted by the hospital, and from gifts and foundations. A small percentage of its income is derived from public funds for the treatment of indigent cases. It is clearly nongovernmental and, accordingly, its employees for the purposes of Article I, paragraph 19 of our Constitution must be regarded as persons in private employment.

B.
Defendant argues that the Union has no standing to sue "to protect the rights of its members" and "for violation of its right to bargain collectively on behalf of its members." The argument is based principally on Article I, paragraph 19 of our Constitution. Thus, it is said the paragraph which reads as follows:
"Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing."
does not refer to unions or their rights. The sole concern of the paragraph, it is stated, is with employees and their individual rights to organize and bargain collectively. It is also contended that the scope of Article I, paragraph 19 is nowise affected by the statutory grants to unions of status to sue or be sued as legal entities contained either in N.J.S. 2A:64-1 et seq. or sec. 301 of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 185; these statutory provisions, it is claimed, are applicable only where a union has some standing as an entity apart from its members, e.g., where it is a party to a collective bargaining agreement as in both Milk Dealers, etc., Local 680 v. Cream-O-Land Dairy, 39 N.J. Super. 163 (App. Div. 1956), and Donnelly v. United Fruit Co., 40 N.J. 61 (1961).
*549 Disregarding for the moment the question as to whether the Union represents a majority of defendant's nonprofessional employees, it appears totally illogical to construe the constitutional provision herein under consideration as granting individual rights which may not be asserted collectively. The portion of Article I, paragraph 19 with which we are concerned, confers upon persons in private employment the right to organize and bargain collectively. It is at once apparent that an organization of employees, whether it be through the means of an independent group or one affiliated with an international labor organization, will eventuate in the creation of a union. This union, or local unit of a parent union, is formed for the express purpose of presenting the demands or desires of its members to the employer for the improvement of wages, hours and conditions of employment. Once a union has been selected and brought into existence by a group of employees, all interests of the employees concerning wages, hours of work and conditions of employment are then asserted through the union. As was stated in Donnelly v. United Fruit Co., supra:
"A union selected as a bargaining agent by a majority of employees (in an appropriate unit) of an employer, in an industry affecting commerce, becomes the exclusive representative of all the employees in the unit for the purpose of collective bargaining with respect to wages, hours and conditions of employment [citation omitted]. The exclusiveness of the agency exists whether the relations between the employer and union are conducted on an open, agency or union shop basis. The powerful role carries with it the responsibility of exercising the utmost good faith toward all employees represented, union and non-union, in negotiating a collective bargaining agreement with the employer, and in administering the agreement during its lifetime." (40 N.J., at pp. 75-76)
Under the argument advanced by defendant, no union would have the status to initiate proceedings against an employer in pursuance of individual rights conferred on employees under Article I, paragraph 19, unless the union had been accepted by the employer as the bargaining agent for his employees. Absent specific labor-management relations legislation, *550 the question is posed as to how union representation might be established for a group of employees without voluntary recognition of the union by their employer. The question becomes more pointed when one considers the questions arising in this action wherein it has been contended that the constitutional grant to individuals with respect to union organization does not apply to the employer because of the nature of its enterprise.
The Union here claims that a majority of defendant's nonprofessional employees have expressed the choice of having it represent them for collective bargaining purposes. Accordingly, it is apparent that the status of the union to maintain this action depends on the resolution of the question as to whether in fact a majority of the employees in the appropriate unit in defendant's employ desire its representation. On the basis of its affirmative assertion that it represents a majority of defendant's employees, the Union has invoked the jurisdiction of this court; defendant denies majority representation, and thus the issue is drawn. The determination of majority representation or not will therefore determine the status of the Union as a proper plaintiff. Of course, if the Union does represent a majority of defendant's employees, it must then be considered as the collective bargaining representative of the employees and, therefore, conferred in that capacity with all of the rights and duties referred to in Donnelly v. United Fruit Co., supra, 40 N.J., at p. 75.

II.
In the third and fourth counts of the complaint, the Union requests this court to construe Article I, paragraph 19 of the Constitution so as to require an affirmative obligation on the part of defendant to bargain with it as the representative of its employees. In answer to this claim, defendant contends that the constitutional provision does nothing more than create a right in the individual employees; that it imposes no obligation upon the employer other than to prohibit him from *551 interfering with the rights of its employees created thereunder. Defendant's argument is based principally on the decision of the Supreme Court of Missouri in Quinn v. Buchanan, 298 S.W.2d 413 (1957). The reliance on the Missouri case is prompted in the main by the citation of that decision by our own Supreme Court in Cooper v. Nutley Sun Printing Co., Inc., supra. In Cooper, our court held that Article I, paragraph 19 protects employees against interference by individuals with the free exercise of the rights granted to them therein, as well as against the abridgement of those rights by legislative or judicial action. In reaching this conclusion, the court cited Quinn v. Buchanan with approval because of its similar holding construing an almost identical provision of the Missouri Constitution. The Missouri Supreme Court, however, after determining that because the constitutional provision declares a right, the violation of which is a legal wrong, there is available every appropriate remedy to redress or prevent violations of that right, went on to state: "However, the constitutional provision provides for no required affirmative duties concerning this right and these remedies can only apply to their violation." 298 S.W.2d, at p. 419. In reaching this conclusion the Missouri court cited as its authority a number of New York decisions holding that a similar New York constitutional provision[3] did not impose upon all employers an affirmative obligation to bargain collectively with unions claiming to represent their employees. The New York decisions cited were decided, however, in a notably different context than that in which we find Art. I, par. 19 of our Constitution of 1947.
*552 The New York constitutional provision had been preceded by the enactment of a comprehensive state Labor Relations Act[4] by the New York Legislature which imposes an affirmative duty upon certain classes of employers to bargain collectively with the representatives chosen by their employees for that purpose. It is within the context of this pre-existing labor legislation that the language of Mr. Justice Botein, in Quill v. Eisenhower, 5 Misc.2d 431, 113 N.Y.S.2d 887, 889 (Sup. Ct. 1952), quoted in Quinn v. Buchanan[5], must be understood. Prior to the decision in Quill v. Eisenhower the Appellate Division of the New York Supreme Court in Trustees of Columbia University of New York v. Herzog, 269 App. Div. 24, 53 N.Y.S.2d 617 (App. Div. 1945), affirmed 295 N.Y. 605, 64 N.E.2d 351 (Ct. App. 1945), had concluded that the constitutional amendment was not intended to invalidate the pre-existing legislation which imposed a duty on employers to bargain with employees, even though that obligation, by reason of certain exemptions or exceptions, was not in all respects coextensive with the rights of labor. The employer involved in both Quill v. Eisenhower, supra, and Trustees of Columbia University v. Herzog, supra, was not required under the New York law to bargain with employee representatives. The New York courts merely held that in those circumstances, the subsequent constitutional provision could not be considered to have imposed any obligations upon *553 the university which had not been obliged to bargain under the pre-existing law. The Missouri Supreme Court in relying upon these New York cases seems to have ignored the significance therein of the pre-existing Labor Law.
What is the nature of the obligation, if any, which is imposed upon employers under the grant of rights to employees found in Article I, paragraph 19 of our Constitution? As I have indicated, defendant argues that the paragraph in question imposes no obligation upon the employer, except that he must not interfere with the rights guaranteed to his employees. The Union, on the other hand, asserts that without the right of enforcement, the constitutional grant of rights found in Article I, paragraph 19 would be meaningless. Research of counsel and the court has indicated that this question has not been answered by our courts.
Two lines of decisions may be found on this question when resort is had to sister jurisdictions.[6] Those cases which comport with the view of the hospital are Quinn v. Buchanan, supra; Western Pennsylvania Hospital v. Lichliter, 340 Pa. 382, 17 A.2d 206, 132 A.L.R. 1146 (Sup. Ct. 1941); St. Lukes Hospital v. Labor Relations Commission, 320 Mass. 467, 70 N.E.2d 10 (Sup. Jud. Ct. 1946); St. Luke's Hospital v. Industrial Commission, 142 Colo. 28, 349 P.2d 995 (Sup. Ct. 1960). Those which are in accord with the Union's contention are represented by Northwestern Hospital v. Public Bldg., etc., No. 113, 208 Minn. 389, 294 N.W. 215 (Sup. Ct. 1940); Wisconsin Empl. Rel. Board v. Evangelical Deaconess Soc., 242 Wis. 78, 7 N.W.2d 590 (Sup. Ct. 1943); National Labor Rel. Board v. Central Disp. & E. Hosp., 79 U.S. App. D.C. 274, 145 F.2d 852 (1944), cert. denied 324 *554 U.S. 847, 65 S.Ct. 684, 89 L.Ed. 1408 (1944); Utah Labor Relations Board v. Utah Valley Hospital, 120 Utah 463, 235 P.2d 520, 26 A.L.R.2d 1012 (Sup. Ct. 1951); Local No. 1644, etc. v. Oakwood Hospital, 367 Mich. 79, 116 N.W.2d 314 (Sup. Ct. 1962). As I have heretofore indicated, the decisions of the courts of the State of New York must be regarded within the context of the labor law pre-existing the constitutional provision.[7]
I deem it unnecessary to attempt to reconcile the conflicting views expressed by the opinions cited. Absent a specific statutory exclusion, I believe that the opinions defy logical reconciliation. This observation is best supported by the words of Justice Arnold in National Labor Rel. Board v. Central Disp. & E. Hospital, supra, when he said:
"Respondent argues that the spirit or policy of the Act is such that we should read into it an exemption of charitable hospitals. In the interpretation of its state labor relations act the Pennsylvania court held that even though the words might be broad enough to include a hospital, nevertheless they could not conceive that the legislature intended to apply the act to such institutions. We are unable to follow the reasoning of the Pennsylvania court. We cannot understand what considerations of public policy deprive hospital employees of the privilege granted to the employees of other institutions. The opinions of the Minnesota and the Wisconsin supreme courts, holding that charitable hospitals and their nonprofessional employees are subject to the labor relations acts of those states, present what seems to us the only tenable view as to the spirit and policy of such statutes." (Citations omitted; 145 F.2d, at p. 853)
*555 It seems to me that to accept the contention of defendant which construes Article I, paragraph 19 to impose no affirmative duty upon an employer to bargain collectively with the representative of his employees renders impotent the rights guaranteed to employees under the constitutional provision. Clearly, this was not the intent of the authors of the provision. Reference to the Proceedings of the N.J. Constitutional Convention of 1947 discloses that the intent of the representatives of organized labor who appeared before the Committee on Rights, Privileges, Amendments and Miscellaneous Provisions, charged, among other things, with the drafting of Article I, was to seek a constitutional provision with respect to the rights of employees that could be enforced in the courts. Labor was not satisfied to permit a constitutional provision which was not self-implementing.[8]
In view of the rather positive pronouncements made at the Constitutional Convention, there seems to be little room *556 for speculation as to what was intended to be the effect of Article I, paragraph 19. In any event, it seems elementary that if one is granted the right to bargain, he must bargain with someone other than himself. If the right to bargain collectively is an enforceable right, as it is intended to be, then the holder of the right or his representative must be considered as having access to every available remedy to enforce it. The plain meaning of the first sentence of paragraph 19 indicates the result contended for here by plaintiffs. In construing a fundamental law such as a written constitution which has been adopted by the majority of all of the people, it is incumbent upon the courts to assume that the language used was used in the ordinary acceptance and, if the provision in question is plain and clear on its face, it is to be interpreted *557 literally. Countryman v. Norton, 21 Hun. 17 (N.Y. Sup. Ct. 1880).
The right to organize and bargain collectively is included in the Rights and Privileges Article of our Constitution and should be accorded the same stature as other fundamental rights. Provisions of a Bill of Rights are primarily limitations on government, declaring rights that exist without any governmental grant, that may not be taken away by government and that government has the duty to protect. 1 Cooley's Constitutional Limitations, 93, 358. In Independent Dairy Workers Union of Hightstown v. Milk Drivers, etc., Local No. 680, 23 N.J. 85, 96 (1956), our Supreme Court held that the rights of employees declared in the constitutional provision herein involved were enforceable when individuals *558 interfered with those rights. No implementing statute to enjoin such interference was deemed necessary for the court to act. In Cooper v. Nutley Sun Printing Co., Inc., 36 N.J. 189, 197 (1961), the court required no legislative implementation to afford an appropriate remedy to redress a violation of those rights. Implicit in these two holdings is a recognition that the rights set forth in the Rights and Privileges Article of our Constitution are actionable. Since this is so, it must be concluded that enforcement of these rights as contained in paragraph 19 must include the power of courts to require an employer to bargain collectively, once his employees have effectively designated their collective bargaining representative.

III.
I turn now to the factual situation which existed with respect to the organizational activities of the Union among the employees of defendant, and the events and circumstances leading up to the discharge of the individual plaintiffs.

A.
During the latter part of the summer of 1962, the Union decided to embark upon a program of organization of the nonprofessional employees of Christ Hospital in Jersey City. Other than the organization of several private nursing homes, no efforts had been made by the Union prior to that time to organize the employees of a voluntary hospital in this State. Prior to its organizational efforts in New Jersey, the Union had conducted successfully several organizational campaigns among the employees of a number of hospitals in the City of New York, including Montefiore, Maimonides, Flower Fifth Avenue, Knickerbocker, and Mt. Sinai Hospitals. To effect the organization of the employees at defendant hospital, the Union assigned one Aberdine David, a professional organizer, who had had experience in organizing several of the hospitals afore-mentioned. During the months of September, October *559 and November 1962, David was successful in procuring some 180 to 185 union membership application cards to be signed by various employees.
On October 12, 1962, ostensibly at the suggestion of David, a meeting was called of employees interested in union representation, at a hall in Jersey City, for the purpose of determining whether demands should be made upon hospital management for recognition. The meeting was held in two sections, covering the two work shifts at the hospital. Robert Burke, the director of the hospital division of the Union, presided at both sections of the meeting. He testified at the trial that as a result of the cards which had been submitted, information given to him by the organizer, and conversation which he had with some eight or ten people at the meetings, he determined to seek recognition of the Union as the bargaining agent for the nonprofessional employees of defendant. Subsequently, on October 16, 1962, a letter was forwarded to the hospital by Leon Davis, president of the Union, advising management that a majority of the nonprofessional employees of the hospital had joined the Union. The letter requested an appointment for the purpose of establishing this fact to the satisfaction of the hospital management; the method of satisfaction was to be either by verification of membership cards or by an independent election. It was also suggested that once it had been substantiated that the Union did represent a majority of the employees, collective bargaining was to be expected.
On October 18, 1962 a letter addressed "Dear Fellow Employee" was distributed to all employees of the hospital by Albert O. Davidsen, its executive director. The tenor of the letter was to assure employees that they should not be frightened by threats that they would lose their jobs if they did not join a particular union.[9]
*560 On October 23, 1962 Mr. Davidsen replied to Mr. Davis by letter, the most pertinent portions of which read as follows:
"Christ Hospital is a law abiding institution. There is no legal precedent for any voluntary non-profit hospital in New Jersey to bargain collectively with a union. When and if the pertinent laws are amended to establish the obligation of voluntary non-profit hospitals to bargain collectively, and the parallel right of the employees of such institutions, we will of course observe and respect such obligations and rights, and will recognize any properly certified union as having been selected by employees in an appropriate group in a secret ballot conducted under and in accordance with regulations under such law.
In the meantime, we shall continue to be as concerned over the interests of each of our employees as we are over our obligation to the community to provide, as we have since 1873, quality health service at reasonable cost."
After receipt of Mr. Davidsen's reply, Burke called another meeting of the membership in Jersey City. At that meeting *561 a strike vote was taken, with the result that a strike was voted in the event of continued failure to recognize the Union, by a vote of 128 to 12. After further attempts to obtain recognition, including requests made to the Episcopal Bishop of the Diocese of Newark, the Commissioner of Labor and Industry of the State of New Jersey, and the New Jersey State Mediation Service, this action was instituted. No strike ever occurred.

B.
Plaintiff Harrison Johnson was hired by defendant in July 1960 as a porter. In October 1961 he was promoted to head porter in which position he was responsible for the supervision of a number of men working under him. When the organizational activities of the Union commenced, he became interested and was actively engaged in interesting his fellow employees in union membership. He was discharged by the hospital on October 12, 1962, and the reason assigned by the executive director, in his words, was as follows:
"I terminated his employment because of the fact that, first, we couldn't find him when we paged him. He countermanded orders, and specifically one thing I thought was very important that here he was a supervisor in a lead position, took five men, plus himself, and took 48 hours to clean an area that could have been cleaned in a third of that time; and I was fearful in that way we would  our care to the patients and the housekeeping service would be deteriorated."
Davidsen testified that his decision to discharge Johnson resulted from reports he had received earlier in the week from Mrs. Doyle, the executive housekeeper of the hospital, who was Johnson's superior. He stated that Mrs. Doyle (who also testified) represented to him that Johnson had countermanded orders she had given as to housekeeping activities, had been unavailable when paged, and also, particularly, that it took him forty-eight hours of overtime with five people and himself to clean an area that could have been cleaned in one-third of the time. Prior to the day of discharge, Johnson had *562 been called to the office by Davidsen and interrogated with respect to his Union activities. Johnson conceded on the witness stand that he denied any activity on behalf of the Union which was then attempting to organize, although this in fact was not true. As the result of a discussion which had developed during a meeting of the housekeeping department a few days earlier, at which the housekeeping department had been commended by Davidsen for the quality of its work, Johnson, after he had assured Davidsen of his non-involvement with the Union, was invited to sit with the personnel committee of the hospital board which was to consider certain proposed employee policies. The policy committee meeting was a luncheon meeting at which there were discussed a proposed pension plan and grievance procedure which Davidsen desired to install for the benefit of hospital employees. After the meeting, Johnson was questioned as to what he thought about the proposed pension plan and grievance procedure, and he agreed to tell the employees about both. Sometime later that day he met his superior, Mrs. Doyle, and informed her of the meeting and what had transpired thereat. During this conversation, Johnson stated to Mrs. Doyle that "he could not sell that kind of stuff" to the workers and that he would not even try. It was four days following the meeting that Johnson was discharged.
Johnson states that on the day of his discharge, he was summoned to Davidsen's office. When he arrived he found present Davidsen, Mrs. Doyle and a Mr. Reiser, who was assistant manager of the hospital. He stated that Davidsen informed him that he had investigated further and that he and Johnson did not see eye to eye. He also stated that Davidsen mentioned the incident regarding the length of time taken to do the job with the five employees and that, as a result, he had determined to discharge Johnson. Johnson stated that at the time of the meeting his final paycheck had been drawn and was presented to him.
Margaret Wilber was hired by Christ Hospital on October 24, 1961 and employed in the housekeeping department. She *563 was discharged on October 18, 1962 by Charles Wengland, the hospital's chief engineer. Mrs. Doyle, the hospital's executive housekeeper, and Mr. Wengland both testified with respect to Mrs. Wilber's discharge. They testified that the action was taken by Wengland after Mrs. Wilber had telephoned in on October 15, 1962 and informed the operator that she had overslept and would not be in at all; that when Mrs. Wilber came in the following day (Tuesday) Mrs. Doyle remonstrated with her for not having come into work later on in the day on Monday and that, nevertheless, on the following day, Wednesday, October 17, 1962, Mrs. Wilber again called in at 9:00 A.M. representing that she had overslept, and again failed to appear for work. She blamed both her Monday and Wednesday absences on the failure of her alarm clock. Mrs. Doyle testified that she complained to Wengland about Mrs. Wilber's absences since she was short of maids. Upon hearing the circumstances of Mrs. Wilber's absences and the reason that she attributed therefor, Wengland testified that he did not believe the excuses and, accordingly, discharged her.
There is no indication in the testimony that Mrs. Wilber was engaged in union activities other than that she wore a union button for the first time on October 18, 1962, the day she was discharged. Wengland in his testimony denied that Mrs. Wilber's union membership had anything to do with her discharge.

C.
Several witnesses testified during the trial concerning events which took place within the hospital during the organizational period. Those testifying on behalf of plaintiffs sought to establish that the management of the hospital demonstrated animus for the Union and union activities, and were successful in communicating to the employees the impression that sanctions might well be invoked should union activity continue. It will serve little purpose to examine this testimony with any particularity. The impression that I received, considering *564 all of this testimony, is that a great deal of uncertainty existed in the minds of the employees with respect to union activities because of management's attitude, and that there existed in the minds of many employees insecurity because of the anti-union acts of certain supervisory personnel which were carried out, albeit without the sanction of management. On the part of the hospital management, there were apparent distrust for the Union which was attempting to organize; understandable fear that the operations of the hospital would be interrupted to the detriment of the patients; and a resolution to thwart union activity by the offer of improved working conditions, and a communication to the workers of the thought that they would be protected by management should the employees desire to resist union organization.
I find that plaintiff Johnson was dismissed from employment because of his acitvities with the Union. The record shows that from the inception of his employment up to a period of approximately two weeks prior to his discharge, Johnson was regarded as an efficient employee and as possessing leadership qualities. Within 16 months of his employment, he was promoted to head-porter. The department in which he held a supervisory position was commended for the efficiency of its activities only shortly prior to the date of his discharge. After the executive director of the hospital received some intelligence with respect to Johnson's union activities, he was invited to attend at policy meetings, at which there was discussed an improvement in the working conditions of the employees. A fair inference may be drawn that the proposed improved employee policies were precipitated by the organizational efforts of the Union. In the face of a fine employment record, a series of charges (which appear flimsy when balanced against that record) were leveled at Johnson without prior warning, and he was summarily discharged. It is also significant to me that at the time he was summoned to the executive's office, his final paycheck had been prepared and was ready to be delivered to him. Accordingly, I find that the rights of Harrison Johnson guaranteed to him under *565 Art. I, par. 19 of the New Jersey Constitution of 1947, have been violated. The defendant is directed to re-employ Harrison Johnson in the position occupied by him on the date of his discharge, October 12, 1962, should Johnson indicate in writing to the hospital administration within 10 days of the date of judgment in this action, of his desire to return to such employment. Upon reinstatement, he shall be paid as back wages from October 12, 1962 to the date of re-employment, any difference between the wages he would have received based on his rate of pay as of October 12, 1962 and any wages he has earned since the date of discharge up to the date of such re-employment, with simple interest thereon.
I do not conclude that the discharge of Margaret Wilber was prompted in any manner by her union activities. The record discloses that Mrs. Wilber's activities with respect to unionization consisted solely of wearing a union button on the day of her discharge. This I deem to have been coincidental. My determination is based upon my observations of Mr. Wengland, the hospital's chief engineer, during his testimony at trial. Wengland was the person who actually discharged Mrs. Wilber. His testimony and demeanor indicated that he is a man of set ways and devoted to strict discipline. I accept his statement to the effect that he was disinclined to believe the excuses given by Mrs. Wilber for her absences, and that her absence record was the reason for her discharge.
Considering all of the evidence adduced at trial, consisting of the testimony of the various witnesses and the exhibits introduced, I am of the opinion that the atmosphere generated by the management of the hospital, during the period in which the Union sought to organize its employees, was such as to tend to hinder and discourage the employees from participating in the efforts of the Union. I do not conclude that the activities of the management were of an invidious nature. The record discloses that the hospital management was of the opinion that the organization of the employees of a private voluntary hospital by a labor union was unlawful under the law of this State. This opinion is borne *566 out by the statement of Mr. Davidsen in his letter of October 23, 1962, quoted above, responding to the president of the Union. Considered in the light of this state of mind, the conduct of management demonstrated toward union activities may readily be understood. Because of these factors, I determine that all of the activities of the hospital management which have interfered with the attempts of its employees to organize were without malice.

IV.
The hospital next contends that in the event it should be determined that employees of voluntary hospitals have the right to organize and bargain collectively as employees of a private employer under Article I, paragraph 19 of our Constitution, and in the further event that that paragraph imposes an affirmative duty upon it to recognize and bargain with the chosen representative of its employees, nevertheless, this court should not grant relief to the Union here, since the Union has failed to demonstrate that it did in fact represent a majority of the appropriate unit of the employees of the hospital. At the trial the hospital went to great lengths to demonstrate that many of the cards applying for membership in the Union which were signed by its employees were actually signed after the date that a demand was made by the Union for recognition as the majority representative of the employees. The hospital also attempted to demonstrate mathematically that the number of applications which should be considered as bona fide was far less than the majority of the employees eligible for organization. In addition, the hospital has attempted to show that the organizational attempts of the Union were in effect of a "shot gun" variety, in that no particularization or selection was exercised in the organizational attempts with respect to job classifications of employees. The hospital argues that there has been no indication of the appropriate unit to be organized in the hospital, and that under such circumstances, taking into consideration the paucity of *567 the number of application cards actually valid and outstanding, no proof has been adduced upon which the court can or should order the relief of recognition as requested by the Union.
The testimony and exhibits with respect to the number of persons actually desirous of joining the Union, and designating it as the collective bargaining representative, leave a great deal of uncertainty. I have heretofore concluded that the atmosphere in the hospital with respect to unionization was not conducive to the voluntary selection or rejection to the Union by the employees. Under such circumstances, it is apparent that a valid determination as to the desires of the employees with respect to unionization is presently incapable of accurate ascertainment, unless each employee is subpoenaed before the court to testify as to his choice in the matter. The time consuming and cumbersome nature of such a procedure should be obvious. The only alternative which can lead to the accuracy desired, is a representation election under the supervision of this court. Because of the time period which has elapsed between the organizational efforts of the Union and termination of this litigation, the following procedure will be adopted: For a period of sixty days subsequent to the entry of a judgment, consistent with the conclusions in this opinion, an orderly program of information may be conducted by both the Union and management of the hospital with the announced goal of a representation election, to be held on a set date to be agreed upon by the Union and defendant hospital, but in any event, not later than seventy days from the entry of judgment. Such election may be conducted by any independent agency or person as may be agreed upon by the Union and defendant or, failing agreement, as may be designated by the court upon application by either the Union or defendant on notice. The cost of conducting the election is to be borne equally by the Union and defendant. Upon the election's being completed and the ballots tabulated, the results thereof shall be reported in writing to this court by authorized representatives of the Union *568 and defendant. Final relief in the premises will abide the result of the election.
The organizational activities of the Union may be directed to all employees of defendant, except doctors (including residents and interns), registered nurses, licensed practical nurses, all professional employees (including those whose occupation requires a license for the practice of a profession), and all supervisory employees who have the authority to hire, or discharge, or effectively recommend the discharge of employees.
In reaching the conclusions herein set forth, I have taken into account the interests of the public, the defendant hospital and its employees. It is apparent that a great deal of anxiety exists in the minds of the hospital administrators with respect to unionization, and any requirement that a union of its employees be recognized. There also appears a belief that collective bargaining will encourage labor unrest, lead to strikes, and thus affect the health and well-being of the sick and disabled who have been admitted to the hospital for treatment. The reason for the existence of paragraph 19 of Article I of our Constitution is to promote peaceful relations between labor and management. It is with this spirit that both management and the employees of the hospital should approach their present concerns. As was stated by the Supreme Court of Minnesota in Northwestern Hospital v. Public Bldg., etc., No. 113, 208 Minn. 389, 294 N.W. 215, 218 (1940):
"In passing there is need to comment upon the possibility of a strike at the hospital. Social consciousness causes one to appreciate that by accepting an employment in a hospital, a person undertakes an obligation to the community as well as to his employer. Only as a coordinated unit can plaintiff function. In many communities cessation of activity at a hospital removes all reasonable opportunity for hospitalization. It may be that a proper regard for community respect and support is sufficient to insure continued operation of a hospital as a unit even in face of the most trying difficulties. * * *"
No costs to any party.
NOTES
[1] N.J.S.A. 34:13B relates to heat, light, power, sanitation, transportation, communication and water (N.J.S.A. 34:13B-1) and includes autobusses, bridge companies, canal companies, ferries and steam boats, gas companies, pipeline companies, railroads, sewer companies, steam and water power companies, street railways, telegraph and telephone companies, tunnel companies and water companies. (N.J.S.A. 34:13B-16) There is nothing in the act that indicates that hospitals should be included therein. Under the provisions of N.J.S.A. 34:13B-16, employees of public utilities are granted the right to organize and bargain collectively.
[2] "MRS. STREETER: Do you consider it necessary to make a distinction between public and private employees?

MR. SCHENK: * * * the records show, in our hearings and others, that the committee had this philosophy: that when public employees bargain with representatives of the State, when you ask the representatives of the State to sit down with the representatives of the public employees, you reduce the State representatives to an equal bargaining partner, because only equals can bargain * * *. The representative of the public authority, representing in effect the vast majority of the people, should not be reduced to the level of an equal bargaining partner * * *." (at p. 328) Further, at p. 655, Mr. Schenk stated that he opposed equal bargaining rights to public employees for "if we grant them the right freely to bargain collectively, we forever tie the hands of the public, the vast majority of the people to deal with problems relating to public employees, because the superior authority of the people, the majority authority of the people, will not be able to maintain the sovereignty of the State and the processes of an orderly society. * * *"
[3] Art. I, Par. 17 (Constitution, 1938) "* * * Employees shall have the right to organize and to bargain collectively through representatives of their own choosing."

The Missouri constitutional provision, Art. I, Sec. 29 (Constitution, 1945) of A.M.S. reads: "That employees shall have the right to organize and to bargain collectively through representatives of their own choosing."
[4] Labor Relations Act of 1937, McKinney's Consol. Laws, c. 31, Labor §§ 700 et seq. sec. 715, lists certain employers exempted from the application of the act, among which are included those of "employees of charitable, educational or religious associations." Section 715 was amended in 1963 to extend the act to employers of nonprofit making hospitals and residential care centers.
[5] "It is evident that the constitutional provision guaranteeing employees the right to organize and bargain collectively through representatives of their own choosing does not cast upon all employers a correlative obligation. The constitutional provision was shaped as a shield; the union seeks to use it as a sword. * * * The constitutional provision was intended to protect employees against legislation or acts which would prevent or interfere with their organization and choice of representatives for the purpose of bargaining collectively."
[6] Among the other jurisdictions cited, constitutional provisions relating to the rights of employees are found only in Missouri (Art. I, sec. 29, supra, note 3). In Massachusetts, the legislature in 1947 enacted Chapter 150B which encourages bargaining in hospitals and provides for governmental intervention when a dispute is not settled. In Utah, the legislature in 1958 amended sec. 34:1-2 of the Utah Labor Act to exclude "any corporation or association operating a hospital."
[7] See, e.g., Brooklyn Hebrew Home and Hospital for Aged v. Ottling, 25 Misc.2d 502, 205 N.Y.S.2d 397 (Sup. Ct. 1960), affirmed 13 App. Div.2d 786, 217 N.Y.S.2d 514 (App. Div. 1961); Prospect Heights Hospital, Inc. v. Davis, 26 Misc.2d 762, 201 N.Y.S.2d 890 (Sup. Ct. 1960); Prospect Heights Hospital, Inc. v. Davis, 22 Misc.2d 511, 194 N.Y.S.2d 779 (Sup. Ct. 1959); Mount Sinai Hospital, Inc. v. Davis, 17 Misc.2d 727, 188 N.Y.S.2d 338 (Sup. Ct. 1959); Beth-El Hospital v. Robbins, 186 Misc. 506, 60 N.Y.S.2d 798 (Sup. Ct. 1946); Society of New York Hospital v. Hanson, 185 Misc. 937, 59 N.Y.S.2d 91 (Sup. Ct. 1945), affirmed 272 App. Div. 998. 73 N.Y.S.2d 835 (App. Div. 1945); Jewish Hospital of Brooklyn v. Doe, 252 App. Div. 581, 300 N.Y. Supp. 1111 (App. Div. 1937).
[8] The original draft of par. 19 read as follows:

"19. The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances. The right of privately employed labor to organize and bargain collectively, and the right of publicly employed labor to organize and present to and make known to the State, or any of its political subdivisions, their grievances and requests through representatives of their own choosing, shall not be impaired." (Emphasis added; II Proceedings 1030)
The view of the labor representatives as to the original proposal may be best shown by the following colloquy between Mr. Thomas Parsonnet, representing the New Jersey State A.F.L., and Mr. Robert Carey of the Committee on Rights, Privileges, Amendments and Miscellaneous Provisions at a meeting of that committee held on August 5, 1947. (III Proceedings 238-241):
"MR. PARSONNET: Perhaps, sir, if I could repeat everything I have said heretofore I could do so with a great deal of simpler construction. Might I say in just a few words, to answer your question, that we do not feel that you have provided a proper amending process; we do not feel that you have given us a self-implementing and effective guarantee against discrimination, or guarantee of the rights of labor to organize and bargain collectively.
MR. CAREY: Now, the Committee says that you may bargain collectively, doesn't it?
MR. PARSONNET: No.
MR. CAREY: What does it say?
MR. PARSONNET: It says that our right to bargain collectively shall not be impaired.
MR. CAREY: Well, have you any rights to bargain collectively?
MR. PARSONNET: Sure we have.
MR. CAREY: Have you any now?
MR. PARSONNET: Yes.
MR. CAREY: You've had them for 50 years, haven't you?
MR. PARSONNET: For 150 years.
MR. CAREY: Never been impaired, have they? Have they?
MR. PARSONNET: That is precisely the point, Judge Carey.
MR. CAREY: Now, let me ask you another question.
MR. PARSONNET: Let me finish that one first. Labor has the right to bargain collectively, but it is unenforceable in our courts, as you know. Now, what I am trying to suggest to you is that instead of saying the right of labor shall not be impaired, the Constitution say that employees shall have the right to organize and bargain collectively, so that we can enforce those rights in the court.
* * * * * * * *
MR. PARSONNET: That is correct, sir. The word picketing was not used in our suggestion. Let me read the balance to you: `to bargain collectively with their employers, and to peacefully strike and conduct peaceful activities in support thereof.' We are not too anxious about those words. If we are given the positive right to organize and bargain collectively, we'll be satisfied.
MR. CAREY: Well, you've got that now, haven't you?
MR. PARSONNET: No, sir. We don't have 
MR. CAREY: One other thing 
MR. PARSONNET: No, let me finish my sentence 
MR. CAREY: One other thing 
MR. PARSONNET: Let me finish my sentence, Judge. You asked me a question, and I'm going to answer it, no matter how much you interrupt.
MR. CAREY: Go ahead.
MR. PARSONNET: We do not have the right to force employers to bargain with us by resort to peaceful court procedures. We must, in order to get employers  intrastate employers  to bargain with us, force them to do it by economic violence, and you should be the first to try to eliminate economic violence."
The final draft of par. 19 which was brought to the floor and adopted by the delegates for consideration of the electorate was introduced by delegate John F. Schenk with the following observation (I Proceedings 659):
"MR. SCHENK: Fellow delegates: This clause of Amendment No. 25 represents the considered opinion of various delegates. I believe all the delegates who introduced amendments to the Committee Proposal participated in its consideration. I think it is self-explanatory. It preserves the basic principle, in my opinion, of the Committee Report that in the case of public employees we must treat the matter somewhat differently at this time, in this age, than in the case of private employees. It meets the objection to the language of the Committee Proposal in two respects  the criticism of the word `impaired' and the suggestion that the language should be positive rather than negative, to have more of a self-implementing factor. I offer this amendment and hope it will be adopted."
The amendment offered is the present paragraph 19 of Article I of our Constitution.
[9] The letter in its entirety reads as follows:

"Dear Fellow Employee:
I am writing this letter to all Christ Hospital employees to talk about some recent developments which are causing worry. Some employees tell me now that they are scared because they have been told they will lose their job if they do not join a particular union.
I am writing to you now about these threats. They are empty threats. Employees are free to join or not to join any union or social group, as they wish. Whether you join or whether you don't join such an organization should be your own voluntary decision. Your decision should not be influenced by a threat or by force.
A threat is a nasty, ugly thing. A man who makes a threat usually has some special purpose of his own. Why are these threats being made? Have you the answer?
If you are threatened or if you have problems or questions of any kind affecting your job, I would like to know promptly. Talk to your supervisor or department head or to Mr. Reiser, or directly to me. This Hospital is as concerned over its obligations to each of its employees as it is over its obligation to this community. Within the financial restrictions of its community obligation, the Hospital will do all that it reasonably can do to improve pay and other conditions for employees.
These threats are nonsense. So long as you do the work assigned to you and so long as you live up to the rules and regulations needed in a big hospital, your job is as secure as the Hospital itself. Christ Hospital has been here since 1873 providing care for the sick of this community.
I expect to write you soon again.
 Sincerely yours,
 (Signed) Albert O. Davidsen
 Executive Director"