145 N.J. Super. 516 (1976)
368 A.2d 408
DONNA M. SHIMP, PLAINTIFF,
v.
NEW JERSEY BELL TELEPHONE COMPANY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided December 20, 1976.
*520 Mr. Stuart B. Finifter for plaintiff (Messrs. Land & Finifter, attorneys; Alfred W. Blumrosen of counsel and on the brief).
Mr. Charles A. Sweeney for defendant.
GRUCCIO, J.S.C.
This case involves a matter of first impression in this State: whether a non-smoking employee is denied a safe working environment and entitled to injunctive relief when forced by proximity to smoking employees to involuntarily inhale "second hand" cigarette smoke.
Plaintiff seeks to have cigarette smoking enjoined in the area where she works. She alleges that her employer, defendant N.J. Bell Telephone Co., is causing her to work in an unsafe environment by refusing to enact a ban against smoking in the office where she works. The company allows other employees to smoke while on the job at desks situated in the same work area as that of plaintiff. Plaintiff contends that the passive inhalation of smoke and the gaseous by-products of burning tobacco is deleterious to her health. Therefore her employer, by permitting employees to smoke in the work area, is allowing an unsafe condition to exist. The present action is a suit to enjoin these allegedly unsafe conditions, thereby restoring to plaintiff a healthy environment in which to work.
The attorneys have submitted affidavits in lieu of oral testimony and it has been agreed that I will decide the issue upon submission of briefs by counsel. Plaintiff's affidavit clearly outlines a legitimate grievance based upon a genuine health problem. She is allergic to cigarette smoke. Mere passive inhalation causes a severe allergic reaction which has forced her to leave work physically ill on numerous occasions.
Plaintiff's representations are substantiated by the affidavits of attending physicians who confirm her sensitivity to cigarette *521 smoke and the negative effect it is having upon her physical well-being. Plaintiff's symptoms evoked by the presence of cigarette smoke include severe throat irritation, nasal irritation sometimes taking the form of nosebleeds, irritation to the eyes which has resulted in corneal abrasion and corneal erosion, headaches, nausea and vomiting. It is important to note that a remission of these symptoms occurs whenever plaintiff remains in a smoke-free environment. Further, it appears that a severe allergic reaction can be triggerd by the presence of as little as one smoker adjacent to plaintiff.
Plaintiff sought to alleviate her intolerable working situation through the use of grievance mechanisms established by collective bargaining between defendant employer and her union. That action, together with other efforts of plaintiff and her physician, resulted in the installation of an exhaust fan in the vicinity of her work area. This attempted solution has proven unsuccessful because the fan was not kept in continuous operation. The other employees complained of cold drafts due to the fan's operation, and compromises involving operation at set intervals have proven ineffective to prevent the onset of plaintiff's symptoms in the presence of smoking co-employees. The pleadings indicate plaintiff has tried every avenue open to her to get relief prior to instituting this action for injunctive relief.
It is clearly the law in this State that an employee has a right to work in a safe environment. An employer is under an affirmative duty to provide a work area that is free from unsafe conditions. McDonald v. Standard Oil Co., 69 N.J.L. 445 (E. & A. 1903); Burns v. Delaware and Atlantic Tel. and Tel. Co., 70 N.J.L. 745 (E. & A. 1904); Clayton v Ainsworth, 122 N.J.L. 160 (E. & A. 1939); Davis v. N.J. Zinc Co., 116 N.J.L. 103 (E. & A. 1936); Canonico v. Celanese Corp. of America, 11 N.J. Super. 445 (App. Div. 1951), certif. den. 7 N.J. 77 (1951). This right to safe and healthful working conditions is protected not only by the duty imposed by common law upon employers, *522 but has also been the subject of federal legislation. In 1970 Congress enacted the Occupational Safety and Health Act (OSHA) 29 U.S.C.A. § 651-78, which expresses a policy of prevention of occupational hazards. The act authorizes the Secretary of Labor to set mandatory occupational safety and health standards in order to assure safe and healthful working conditions 29 U.S.C.A. § 651. Under the general duty clause, 29 U.S.C.A. § 654(a) (1), Congress imposed upon the employer a duty to eliminate all foreseeable and preventable hazards. Cal. Stevedore & Ballast Co. v. O.S.H.R.C., 517 F.2d 986, 988 (9 Cir.1975); Nat'l. Realty & Constr. Co. v. O.S.H.R.C., 160 U.S. App. D.C. 133, 489 F.2d 1257, 1265-67 (D.C. Cir.1973). OSHA in no way preempted the field of occupational safety. Specifically, 29 U.S.C.A. § 653(b) (4) recognizes concurrent state power to act either legislatively or judicially under the common law with regard to occupational safety.[1]
In Canonico v. Celanese Corp. of America, supra, plaintiff was seeking to recover damages for illness allegedly contracted from the inhalation of cellulose acetate dust. The dust was a result of the manufacturing process in which plaintiff was employed. His job location was in the pulverizing room where as much as 400 pounds of dust could be present and circulating in the air in a single day. The court reiterated the common law premise that it is the master's duty to use reasonable care to provide a proper and safe place for the servant to work and that failure to use reasonable diligence to protect the employee from unnecessary risks will cause the employer to be answerable for the damages which ensue. The court upheld the trial judge's dismissal *523 of the cause of action, emphasizing that cellulose acetate dust is a nontoxic result of the manufacturing process.
Two important distinctions are found between the Canonico decision and the present case. In Canonico the court was presented with a by-product which was a necessary result of the operation of the business. There is no way to pulverize cellulose acetate material without creating dust. The denial of recovery for an occupational disease where the nature of the risk is obvious or known to the employee is based on the theory that the employee assumes the risk as ordinarily incident to his employment. Canonico v. Celanese Corp. of America, supra; Zebrowski v. Warner Sugar Co., 83 N.J.L. 558 (E. & A. 1912). Plaintiff's complaint arises from the presence of cigarette smoke in the atmosphere of her work environment. Cigarette smoke, unlike cellulose dust, is not a natural by-product of N.J. Bell's business. Plaintiff works in an office. The tools of her trade are pens, pencils, paper, a typewriter and a telephone. There is no necessity to fill the air with tobacco smoke in order to carry on defendant's business, so it cannot be regarded as an occupational hazard which plaintiff has voluntarily assumed in pursuing a career as a secretary.
This case is further distinguishable from Canonico based on the nature of the substance which is being inhaled. In Canonico the trial judge found that the dust was a nontoxic substance. Evidence presented by a medical expert indicated that no one else he had ever seen had suffered disease or illness attributable to the inhalation of cellulose acetate dust. The Appellate Division upheld the trial court's determination that the dust was nontoxic. In the present case the substance being introduced into the air has a far more questionable record. The evidence against tobacco smoke is strong. I shall discuss the evidence presented to me later but note here that the smoke from burning cigarettes is toxic and deleterious to the health not only of smokers but also of nonsmokers who are exposed to "second hand" smoke, as plaintiff is here. It is evident that plaintiff is confronted *524 with a work environment contaminated by the presence of a nonnecessary toxic substance.
Where an employer is under a common law duty to act, a court of equity may enforce an employee's rights by ordering the employer to eliminate any preventable hazardous condition which the court finds to exist. The courts of New Jersey have long been open to protect basic employees' rights by injunction. Independent Dairy Workers v. Milk Drivers Local No. 680, 23 N.J. 85, 30 N.J. 173 (1959); Cooper v. Nutley Son Printing Co. Inc., 36 N.J. 189 (1961); Johnson v. Christ Hospital, 84 N.J. Super. 541 (Ch. Div. 1964) aff'd 45 N.J. 108 (1965). Although dealing with employee's collective bargaining rights, these cases establish the underlying principle that the powers of a court of equity are available in labor matters unless the subject matter is specifically withdrawn from its jurisdiction by the legislature.
The authority of this court has not been affected by the Workmen's Compensation Act, N.J.S.A. 34:15-1 et seq. The provisions of N.J.S.A. 34:15-8 cover the presumptively elective surrender by the parties of "their rights to any other method, form or amount of compensation or determination thereof * * *" (emphasis supplied). This provision bars only the common law action in tort for damages resulting from work-related injury and make the workmen's compensation system the exclusive method of securing money recoveries. The act is silent with respect to the question of injunctive relief against occupational hazards. There is no provision in the act making it the exclusive method of protecting the worker against an occupational hazard. The act becomes the exclusive remedy for the employee when the hazard has ripened to injury.
In Cooper v. Nutley Son Printing Co., supra, the Supreme Court dealt with the question of employees' rights to organize and the court's powers to enforce those rights. Referring to Independent Dairy Workers v. Milk Drivers Local No. 680, supra, the court said (36 N.J. at 197) that it *525 "needed no implementing statute to enjoin the interfering conduct. It follows that the court in the present case needs no legislative implementation to afford an appropriate remedy to redress a violation of those rights." The same equitable power to afford a remedy exists in the present case. The power which a court of equity possesses to fashion a remedy is a broad power. The form of relief granted rises from the needs and rights of the parties demonstrated to the court. The Supreme Court discussed this power at length in Cooper, supra:
If the trial court finds the individual plaintiffs' constitutional rights have been infringed upon, it can exercise its vast equitable powers and grant the relief which the circumstances dictate. As was stated in Westinghouse Electric Corp. v. United Electrical, Radio and Machine Workers of America, Local No. 410, 139 N.J. Eq. 97, 108 (E. & A. 1946):
"A wrong suffered without a remedy is a blot upon the sound administration of justice. In the dissenting words of Cardozo, C.J., in Graf et al. v. Hope Building Corp., 254 N.Y. 1, 171 N.E. 884, 888, 70 A.L.R. 984, * * * Let the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path. Griswold v. Hazard, 141 U.S. 260, 284; 11 S.Ct. 972, 999, 35 L.Ed. 678. Cf. Fifth Avenue Bank (of New York) v. Compson, 113 N.J. Eq. 152, 153; 166 A. 86. This is justice in action. This is giving meaning to the proper exercise of the jurisdiction of the Court of Chancery."
The broad extent of equity's powers to remedy a wrong was aptly described by Justice Heher in Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 411-412 (E. & A. 1938):
"Equitable remedies `are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.' Pomeroy's Equity Jurisprudence sec. 109.
A lack of precedent, or mere novelty in incident, is no obstacle to the award of equitable relief, if the case presented is referable to an established head of equity jurisprudence-either of primary right or of remedy merely." [at 198]
Since plaintiff has a common law right to a safe working environment, the issue remains whether the work area here *526 is unsafe due to a preventable hazard which I may enjoin. There can be no doubt that the by-products of burning tobacco are toxic and dangerous to the health of smokers and non smokers generally and this plaintiff in particular.
In 1965 Congress officially recognized the dangerous nature of cigarette smoke and declared a national policy to warn the public of the danger and to discourage cigarette smoking. In 1970 the Public Health Cigarette Smoking Act, 15 U.S.C.A. § 1331 et seq., strengthened the warning language which all cigarette packages were required by the 1965 statute to bear.[2] 15 U.S.C.A. § 1331 declares:
It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby  (1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes * * *
In furtherance of this policy 15 U.S.C.A. § 1333 makes it unlawful to sell cigarettes in the United States unless they bear the statement, "Warning: The Surgeon General Has Determined That Cigarette Smoking is Dangerous To Your Health," conspicuously imprinted on the side of every package.[3]
*527 Additionally, the Congress in 1970 determined that the hazardous nature of cigarettes is significant enough to warrant affirmative action to counteract the persuasive effect of cigarette advertising. 15 U.S.C.A. § 1335 bans the advertising of cigarettes from radio and television. The advertisements totally ignored the health hazards and promoted the idea that cigarette smoking is both pleasurable and harmless.[4] Despite the presentation of anti-smoking commercials, such advertising on the popular media of radio and television tended to offset the effectiveness of the warnings. Consequently, Congress took remedial action in the public interest and banned cigarette promotion on the airwaves.
Where a matter is generally accepted by mankind as true and is capable of ready demonstration by means commonly recognized as authoritative, the court may use that matter as an aid in its consideration. Grand View Gardens, Inc. v. Hasbrouck Heights, 14 N.J. Super. 167 (App. Div. 1951). The national policy to recognize and warn the public of the dangerous nature of cigarette smoke has made that fact generally accepted. Therefore, I take judicial notice of the toxic nature of cigarette smoke and its well known association with emphysema, lung cancer and heart disease.
The HEW report for 1975, The Health Consequences of Smoking, and the Surgeon General's report of the same title for 1972 reveal distressing new evidence in the continuing investigation of the toxic nature of cigarette smoke. The reports indicate that the mere presence of cigarette smoke in the air pollutes it, changing carbon monoxide levels and effectively making involuntary smokers of all who breathe the air. Prior to these reports it was generally accepted that smoking is a hazard voluntarily undertaken. To smoke or not to smoke was considered the choice of the individual, and a smoker once informed of the risk imperiled *528 no one's health but his or her own when he or she chose to ignore the warnings.
The 1972 report of the Surgeon General has shown that such is not the case. The report indicates that a burning cigarette contaminates the air with "sidestream" smoke which comes from the burning cone and mouthpiece of the cigarette between puffs as well as with the smoke exhaled by the smoker. The presence of this smoke in the air not only contributes to the discomfort of nonsmokers, but also increases the carbon monoxide level and adds tar, nicotine and the oxides of nitrogen to the available air supply. These substances are harmful to the health of an exposed person particularly those who have chronic coronary heart or broncho pulmonary disease.
The Surgeon General's findings are supported strongly by the evidence which has been presented to me. The affidavit of Dr. Luthor Terry, who served as Surgeon General of the United States from 1961 to 1965 and is an expert in cardiovascular disease, divides the effects of tobacco smoke on nonsmokers into three categories. The first category includes that small percentage of the population who are genuinely sensitive to tobacco smoke and experience allergic manifestations. Dr. Terry notes that while he has not personally examined plaintiff, she appears to fall into this class of nonsmokers. The next category includes persons with chronic disease, especially cardiovascular disease and lung disease. These people are particularly vulnerable to the effects of involuntary smoking which may significantly exacerbate their medical conditions. Finally, a large proportion of the non-smoking population finds it unpleasant and uncomfortable to be exposed to significant amounts of tobacco smoke. Having reviewed the scientific data and medical evidence available, Dr. Terry concludes that passive smoking in the workplace can be injurious to the health of a significant percentage of the working population.
This evidence is reiterated in the other affidavits before me. The affidavit of Dr. Jesse Steinfeld, Professor of Medicine *529 at the University of California and a member of the American Association for Cancer Research, repeats the carcinogenic and otherwise toxic nature of the chemicals in tobacco smoke. Dr. Steinfeld states "While the primary toxic effects of tobacco smoking occur in the individual who inhales the mainstream smoke, it is quite clear that sidestream smoke contains a considerable amount of material which is toxic to the passive smoker who is near others who smoke."
Dr. Wilbert S. Aronow, a Cardiologist who is Chief of Cardiovascular Research at the University of California at Irvine, has submitted with his affidavit the results of extensive research and testimony collected in a paper entitled "The Effect of Passive Smoking on the Cardiovascular and Respiratory Systems." In the paper Dr. Aronow concludes that passive smoking not only aggravates the condition of persons with cardiovascular or pulmonary disease, but also may lead to increased respiratory tract infections and precipitate respiratory and other symptoms in nonallergic patients sensitive to tobacco.
In dealing with the question of allergy to tobacco smoke, several of the physicians submitting affidavits recognized such an allergy as a serious health problem which could produce severe symptoms and may lead to a deterioration of the patients overall condition. Dr. Michael Diamond, a specialist in allergy and immunology, estimates that 10% of the United States population has an allergy to tobacco smoke, producing symptoms such as coughing, wheezing, eye itching and headaches upon minimal exposure to smoke. Dr. Frank Rosen has submitted his study of a case in which a one-year-old child developed bronchial asthma due to allergy to tobacco smoke. A report of similar adverse effects upon children with smoking parents has been made by Drs. Hall and Hyde, Pediatricians associated with the University of Rochester Medical Center. Dr. Richard Brams, an allergy specialist who has personally treated plaintiff for her symptoms, has diagnosed her condition as respiratory allergy aggravated by the combination of tobacco smoke and poor ventilation *530 at her work environment. Dr. Brams included with his affidavit scientific data and reports of allergy and respiratory specialists in support of his professional opinion that toxic cigarette smoke is the cause of plaintiff's on-the-job health problems and that she and others like herself should be protected from this hazard.
The opinion that tobacco smoke should be eliminated from the work environment is shared by specialists in the field of industrial medicine. Dr. Susan Daum is an internist who has done extensive work in the field of occupational safety in affiliation with the Environmental Science Laboratory at Mount Sinai School of Medicine and the Rutgers University Labor Education Center. Based on her experience she states:
Longterm health hazards causing or contributing to chronic disease are rarely recognized as work related and impede the collection of data necessary to promulgate a safe limit of low level exposure. In the absence of such data or longterm scientific studies dealing with a known noxious agent, it is a sound and accepted procedure in the practice of preventive medicine to eliminate the hazardous substance whenever possible until firm scientific guidelines can be established.
Dr. Donald Bews, a specialist in occupational medicine certified by the American Board of Preventive Medicine, shares Dr. Daum's view that tobacco smoke should be eliminated from the work area. He states that based on 28 years of experience in the field as medical director to Bell Telephone of Canada, and having observed the deleterious effects of smoking on the health of the active and passive smoker, it is his professional judgment that the work environment should be free of tobacco smoke, one of the major sources of air pollution.
The evidence is clear and overwhelming. Cigarette smoke contaminates and pollutes the air, creating a health hazard not merely to the smoker but to all those around her who must rely upon the same air supply. The right of an individual to risk his or her own health does not include the right to jeopardize the health of those who must remain around him or her in order to properly perform the duties of *531 their jobs. The portion of the population which is especially sensitive to cigarette smoke is so significant that it is reasonable to expect an employer to foresee health consequences and to impose upon him a duty to abate the hazard which causes the discomfort. I order New Jersey Bell Telephone Company to do so.
In determining the extent to which smoking must be restricted the rights and interests of smoking and non-smoking employees alike must be considered. The employees' right to a safe working environment makes it clear that smoking must be forbidden in the work area. The employee who desires to smoke on his own time, during coffee breaks and lunch hours, should have a reasonably accessible area in which to smoke. In the present case the employees' lunchroom and lounge could serve this function. Such a rule imposes no hardship upon defendant New Jersey Bell Telephone Company. The company already has in effect a rule that cigarettes may not be smoked around the telephone equipment. The rationale behind the rule is that the machines are extremely sensitive and can be damaged by the smoke. Human beings are also very sensitive and can be damaged by cigarette smoke. Unlike a piece of machinery, the damage to a human is all too often irreparable. If a circuit or wiring goes bad, the company can install a replacement part. It is not so simple in the case of a human lung, eye or heart. The parts are hard to come by, if indeed they can be found at all.
A company which has demonstrated such concern for its mechanical components should have at least as much concern for its human beings. Plaintiff asks nothing more than to be able to breathe the air in its clear and natural state.
Accordingly, I order defendant New Jersey Bell Telephone Company to provide safe working conditions for plaintiff by restricting the smoking of employees to the nonwork area presently used as a lunchroom. No smoking shall be permitted in the offices or adjacent customer service area.
It is so ordered.
NOTES
[1] The section reads:

"Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment."
[2] Federal Cigarette Labeling and Advertising Act, Pub. L. 89-92 July 27, 1965, 79 Stat. 282. The legislative history and purpose of the act may be found at 1965 U.S. Code Cong. and Ad. News, p. 2350. The act was in response to a finding of the Surgeon General adopted by the Department of Health, Education and Welfare, that "cigarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action."
[3] The predecessor statute required the milder statement: "Caution: Cigarette Smoking May Be Hazardous To Your Health." (Emphasis supplied). A review of the legislative history reveals that the change in wording was the result of recommendations by the Secretary of Health, Education and Welfare and the Federal Trade Commission. Pub. L. 91-222, 1970 U.S. Code Cong. and Ad. News, p. 2652. See especially, Senate Report 91-566. The F.T.C. report concluded, "Because cigarette smoking is so strongly habit forming, it is unlikely that a mildly phrased cautionary statement will have any effect on confirmed cigarette smokers." 1970 U.S. Code Cong. and Ad. News, p. 2655.
[4] Senate Report 91-566, supra, citing the F.T.C. Rept. for 1967 at pages 8 and 26.