290 N.J. Super. 359 (1996)
675 A.2d 1155
SOUTH JERSEY CATHOLIC SCHOOL TEACHERS ASSOCIATION, PLAINTIFF-APPELLANT,
v.
ST. TERESA OF THE INFANT JESUS CHURCH ELEMENTARY SCHOOL, SAINT BARTHOLOMEW CHURCH ELEMENTARY SCHOOL, THE CHURCH OF ST. JUDE ELEMENTARY SCHOOL, SAINT JOSEPH PRO-CATHEDRAL CHURCH ELEMENTARY SCHOOL, SAINT JOSEPH CHURCH ELEMENTARY SCHOOL AND SACRED HEART ELEMENTARY SCHOOL, DEFENDANTS-RESPONDENTS, AND UNITED STATES OF AMERICA, INTERVENOR.
Superior Court of New Jersey, Appellate Division.
Argued February 15, 1996.
Decided May 16, 1996.
*367 Before Judges KING, KLEINER and HUMPHREYS.
Benjamin Eisner argued the cause for appellant (Spear, Wilderman, Borish, Endy, Spear and Runckel, attorneys; Katherine L. Schreiber, of counsel and on the brief).
Martin F. McKernan, Jr., argued the cause for respondents (McKernan, McKernan & Godino, attorneys).
Patricia A. Millett argued the cause for intervenor (Faith S. Hochberg, U.S. Attorney, Department of Justice, attorney; Frank W. Hunger, Assistant Attorney General, Michael Jay Singer, John L. Jacobus and Ms. Millett, on the brief).
Marc D. Stern, attorney for amicus curiae Coalition for the Free Exercise of Religion, filed a brief.
The opinion of the court was delivered by KING, P.J.A.D.

I.
This case involves the right of parochial elementary school lay teachers to organize and bargain collectively with the six parish schools where they work. The schools are operated by these *368 parishes under the auspices of the Diocese of Camden. These Catholic elementary school teachers claim the right to organize and bargain collectively secured to persons in private employment under Art. I, par. 19 of the New Jersey Constitution of 1947: "Persons in private employment shall have the right to organize and bargain collectively." The Diocese contends that it has the absolute right to refuse to recognize and to bargain collectively with any union because of the Religion Clauses of the First Amendment to the United States Constitution.
The Chancery Division judge agreed with the schools and the Diocese and dismissed the suit by the plaintiff, South Jersey Catholic School Teachers Association (SCTO), on federal constitutional grounds. We disagree and reverse.
We conclude that the compelling state governmental interest expressed in the grant of the fundamental right to organize and bargain collectively by the New Jersey State constitution prevails over the claim of an unconstitutional burden on the parish schools' and Diocese's free exercise of religion. We remand and direct the Chancery Division to order an official representational election and require defendants to bargain collectively with the chosen representative of the lay teachers.

II.
On August 24, 1994 the plaintiff filed this complaint seeking a mandatory injunction compelling the Diocese's six elementary schools named as defendants to recognize it as the representative of the lay teachers and to bargain over terms and conditions of employment. In the alternative, the plaintiff sought an order requiring a secret-ballot election among the lay teachers to determine if plaintiff was indeed the majority representative. If so, plaintiff sought an order to compel collective bargaining.
On September 30, 1994 defendants filed a motion to dismiss the complaint for lack of subject-matter jurisdiction. On November 10, 1994 the plaintiff cross-moved for summary judgment. On December 16, 1994, after argument, the Chancery Division judge *369 rendered an oral opinion in defendants' favor. The judge expressed concern that defendants' First Amendment free exercise of religion rights would be impaired by a requirement that the schools recognize a teachers' union and bargain with it over terms and conditions of employment. He was also concerned that church-state entanglement would occur if plaintiff obtained relief. He granted summary judgment to the defendants.

III.
The Diocese of Camden was established by Pope Pius XI in 1938. The counties of Atlantic, Camden, Cape May, Cumberland, Gloucester and Salem comprise the Diocese. Saint Joseph Camden's Pro-Cathedral, Saint Bartholomew's Church in Camden, The Church of Saint Teresa of the Infant Jesus in Runnemede, Saint Jude's Church in Gloucester Township, Sacred Heart Church in Vineland and Saint Joseph's Church in Hammonton, the six named defendants, all own, operate and maintain Catholic elementary schools. According to the certification of Reverend Monsignor Leonard Scott, Judicial Vicar of the Diocese of Camden, these schools are called "Catholic" because
they are supervised by an ecclesiastical juridic person, that is, the parish. It is their supervision by the parish that makes them "Catholic." The respective pastors of these six parishes are responsible for the operation and maintenance of these schools and they are charged with the supervision and administration of these institutions. These pastors are answerable to the Bishop of the Diocese of Camden who ... is to maintain "vigilance" over the schools which are operated by the parishes and who is authorized "to issue prescriptions dealing with the general regulation of Catholic schools[.]" The Bishop of the Diocese is, in turn, answerable to the Pope.
The heads of the six parish schools submitted nearly identical certifications which demonstrate that either an overwhelming majority or all the teachers in each of the six schools are laypersons. The certifications stressed the importance of these lay teachers:
[T]he example of these adult lay teachers is perhaps even more crucial than the example that could be offered by priests or nuns. These lay teachers are expected, by their very word and action, by their lifestyle and by everything that they do or say, to uphold and live by the teachings of the Roman Catholic Church, to inculcate these teachings wherever and whenever possible and to serve as living witnesses of *370 a faith-filled life. As the Pastor I would dismiss any teacher who expressed positions in the classroom contrary to the teachings of the Catholic Church.
[The elementary school], unlike Catholic high schools and colleges, works with children at an extremely impressionable and formative age when the inculcation of the Faith is especially important. The School works with the Catholic students to prepare them for the sacraments of First Penance, First Holy Communion and Confirmation which means that the School is especially important in preparing the young for the sacramental element of their lives that will be the bedrock of their religious faith in the years to come.
Plaintiff is a member of the National Association of Catholic School Teachers. Members of the Association represent lay elementary and lay high school teachers for purposes of collective bargaining in other parts of the nation, including high school teachers in the dioceses in Trenton and Camden, New Jersey.
Since 1984 the Camden Diocese has recognized plaintiff SCTO as the collective bargaining representative of the approximately 223 lay high school teachers in the high schools it sponsors. Plaintiff and the Diocese have negotiated a series of collective bargaining agreements covering these secondary-school lay teachers.
On August 9, 1993 union activists held a meeting at the home of William Blumenstein, plaintiff's president and a teacher at one of the Diocese's high schools. Four members of the union's executive board and five lay teachers from two of the elementary schools in the Diocese met to discuss plaintiff undertaking organizing efforts on behalf of the lay elementary teachers. In September 1993 plaintiff's executive board approved organizing efforts and expenditures for printing and copying an informational distribution to the elementary school teachers. The SCTO Chronicle, the union's newsletter, was distributed to teachers outside regional in-service locations in October and November 1993. The newsletter contained an authorization form on which the teachers could designate plaintiff as their representative in collective bargaining with the Diocese. Throughout this time, plaintiff's members met with teachers at the various schools who were interested in representation.
*371 According to certifications by Blumenstein and Christopher Ehrmann, plaintiff's regional representative, plaintiff was designated as the representative of a majority of the lay elementary teachers at the six elementary schools. According to Blumenstein, plaintiff's majority status can be confirmed by conducting an in camera review of the authorization cards signed by the teachers and a comparison of the signatures with the teachers' signatures on their W-4 forms. The authorization cards are not contained in the record. However, defendants do not dispute the claim that plaintiff SCTO has received majority support as the elementary school teachers' representative.
Beginning in November 1993, plaintiff opened a dialogue with the Diocese regarding its desire to represent the lay elementary teachers. In March 1994, Blumenstein met with Bishop James McHugh who presented him with a document entitled Minimum Standards for Organizations Wishing to Represent Lay Teachers in a Parish or Regional Catholic Elementary School in the Diocese of Camden (minimum standards). Bishop McHugh told Blumenstein that plaintiff's agreement to the minimum standards was a precondition both for recognizing the union and for permitting the teachers to vote on the question of union representation. Blumenstein was also told that the minimum standards were not negotiable.
The preamble of the minimum standards first acknowledges the Roman Catholic Church's recognition of the dignity of labor, stating:
The Catholic Church, beginning with the Encyclical Letter of Pope Leo XIII in 1891, The Condition of Labor (Rerum Novarum), and continuing over 100 years until the recent Encyclical Letter of Pope John Paul II in 1991, Centesimus Annus, has developed an admirable body of teaching on social, economic, political and cultural matters. This rich heritage of the social teaching of the Church has evolved in response to very differing economic and political contexts. While it is thus marked by significant shifts in both attitude and methodology, it represents the Catholic Church's evolving response to the Evangelical challenge to live a responsible Christian life amidst the complexities of rapidly-changing modern society.
During the past Century Catholic social teaching has supported, in the strongest possible terms, the right of workers to organize into bona fide unions. Such unions *372 are intended to counter working conditions which are unfair or unjust, so that the working man or woman may not be exploited by employers who denigrate the dignity of the human person in favor of profit and power. We fully affirm and endorse this teaching of the Church.
The preamble of the minimum standards then relates the role of Catholic elementary schools:
At the same time we must recognize that the Catholic elementary schools, operated and administered by the various parishes as part of their teaching mission, have a special nature and purpose that must be respected and preserved. They are an essential part of the religious mission of the Church on the parish level, and it is impossible to separate their educational function from their primary religious purpose, which, of course, is the reason for their existence. The Catholic elementary school teacher, too, as a professional who, through the local pastors, shares in the teaching and sanctifying missions of the Church and the bishop, exercises a special and privileged role in the Church in transmitting and conveying the Faith to those of such an impressionable age. Bound by charity to one another and to their students, and penetrated by an apostolic spirit, Catholic school teachers in the parish and regionalized elementary schools, are called to give a special witness to Christ, the unique Teacher, by their lives as well as by their teachings. Theirs is a calling which requires extraordinary qualities, to challenge the minds and hearts of youth, to bring them knowledge and truth, and to be role models of what every Christian is called to be by Christ and by his Church. However, it is a distinct calling since it is in these especially formative years that their young students are most susceptible to both explicit teaching and personal example and during which the pastors are charged by the Church to prepare them  with the help of others  for life's sacramental journey through the reception of First Penance, First Communion and Confirmation.
With respect to labor relations, the minimum standards provide that because of the unique nature of the Catholic elementary school, "neither the courts nor any governmental labor relations board or similar entity shall be involved in any way whatsoever in the enforcement, interpretation or application of these minimum standards or any other agreement between the parties." The minimum standards further provide that the right to hire, suspend, discharge or otherwise discipline a teacher shall be reserved to the parishes; disputes shall be resolved by the pastor; any dispute relating to disciplinary action against a lay teacher resulting in suspension or termination shall be appealable to a Pastors' Appeal Board; any teacher who by public action or statement contradicts or subverts the teachings of the Catholic Church or the policies of the Diocese shall be subject to immediate dismissal; *373 the judgment of the Bishop on these questions shall be final; and the matters addressed in the minimum standards are not subject to negotiation by the organization chosen by the lay teachers to represent them.[1]
*374 Blumenstein certified that the minimum standards were unacceptable to plaintiff as the basis for conducting an election among the elementary teachers because these standards required the plaintiff to agree, in advance, to certain matters that are properly the subject of collective bargaining. In late June 1994, plaintiff wrote to each of the defendant schools requesting recognition as the collective bargaining representative of the lay elementary teachers. Shortly after this, each school responded with an identical letter refusing to recognize plaintiff or to hold an election without prior agreement to the minimum standards. In early July 1994 plaintiff informed defendants that although it recognized that *375 matters affecting the teachings of the Catholic Church, whether in faith and morals or the policies of the Diocese in that regard, are within the sole province of the Bishop, it could not sign the minimum standards and would seek relief through the courts.

IV.
We first address the issue of "lack of subject matter jurisdiction" because this was nominally the reason the Chancery Division judge declined relief. Generally, there are three types of federal preemption in the field of labor relations: (1) Supremacy Clause preemption, where the validity of a state statute or regulation is attacked as violative of the federal Supremacy Clause; (2) claim or choice-of-law preemption, where federal law must be applied even though both the state and federal courts have concurrent jurisdiction; and (3) choice-of-forum preemption, which is jurisdictional, because it relates to whether the state court has any adjudicatory power. Maher v. New Jersey Transit Rail Operations, 239 N.J. Super. 213, 220-21, 570 A.2d 1289 (App.Div. 1990), modified, 125 N.J. 455, 593 A.2d 750 (1991). The third type of federal preemption is the issue in this case.
In the labor-management field, under the National Labor Relations Act (Act), Congress has not expressly provided for exclusive federal jurisdiction. Chamber of Commerce of U.S. v. State, 89 N.J. 131, 142-43, 445 A.2d 353 (1982). Nonetheless, states are preempted from acting on matters even arguably subject to the Act unless the NLRB has declined or would decline to assert jurisdiction. Lay Fac. Ass'n v. Newark Archdiocese, 122 N.J. Super. 260, 269, 300 A.2d 173 (App.Div. 1973). In Lay Fac. Ass'n an association alleged to represent the majority of the lay faculty members of the Archdiocese's secondary schools claimed that the Archdiocese had violated Article I, paragraph 19 of the New Jersey Constitution by failing to bargain collectively with the *376 association and sought an order requiring collective bargaining. The Chancery Division judge entered judgment requiring the Archdiocese to bargain collectively. We held that the NLRB should determine whether it would exercise jurisdiction over the controversy because there was no provision in the Act exempting the employment relationship in issue and we instructed the parties to seek an advisory opinion from the NLRB on that question, while retaining jurisdiction. We said that if the NLRB declined to exercise jurisdiction, we would order an affirmance of the judgment in the Chancery Division. Id. at 273, 300 A.2d 173. The matter returned to this court after the NLRB would not exercise jurisdiction. We summarily affirmed the judgment, ordering collective bargaining. Lay Faculty Ass'n v. Newark Archdiocese, 124 N.J. Super. 369, 372, 307 A.2d 119 (App.Div. 1973).
Six years later, in NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Supreme Court addressed the question whether teachers in schools operated by a church which taught both religious and secular subjects were within the jurisdiction of the Act. The Court held that in the absence of a clear intention on the part of Congress that such teachers were covered by the Act, and in view of the serious First Amendment questions that would follow from the NLRB's exercise of jurisdiction over teachers in church-operated schools, the NLRB was prevented from exercising jurisdiction over these teachers. 440 U.S. at 504-07, 99 S.Ct. at 1320-22, 59 L.Ed.2d at 543-545. Catholic Bishop was decided strictly on statutory construction grounds and did not reach the constitutional issues.
In light of this Supreme Court decision, similar to the situation where the NLRB declines jurisdiction because of the subject matter's minimal impact on interstate commerce, "state tribunals are free to exercise jurisdiction over the subject matter." Cooper v. Nutley Sun Printing Co., 36 N.J. 189, 194, 175 A.2d 639 (1961) (holding that in light of the NLRB's refusal to take jurisdiction, the Chancery Division was not barred by federal preemption from assuming jurisdiction.) See also Christ the King *377 Regional High Sch. v. Culvert, 815 F.2d 219, 222-23 (2d Cir.) (holding that under Catholic Bishop, the Act did not preempt New York State's Labor Relations Board from exercising jurisdiction over a labor dispute between a church-affiliated high school and a union of lay faculty teachers), cert. denied, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987). Finally, the absence of regulatory labor legislation in New Jersey with respect to private employment and the disinclination of the Legislature to provide bureaucratic machinery for the control of intrastate private-sector labor matters, permits a state court of general jurisdiction to address this action. Johnson v. Christ Hosp., 84 N.J. Super. 541, 545, 202 A.2d 874 (Ch.Div. 1964), aff'd per curiam, 45 N.J. 108, 211 A.2d 376 (1965).

V.
The plaintiff maintains that the judge incorrectly analyzed defendants' free exercise claim by relying on the Establishment Clause concept of "entanglement." Plaintiff contends that Article I, paragraph 19 of the New Jersey Constitution is neither an establishment of religion nor a substantial burden on defendants' free exercise of religion because it requires only that the parties bargain. No state regulatory agency or mechanism for enforcement or review of the collectively bargaining process is implicated. Plaintiff points out that defendants are required to comply with secular laws, i.e., educational standards and safety codes, among others. Plaintiff maintains that defendants' free exercise concerns can be accommodated by the judiciary's application of neutral principles of contract and labor law with respect to any dispute that might arise and by plaintiff's assurance that it intends to bargain only on secular issues, such as wages, hours, tenure, work assignments, vacation and personal time, illness and disability leave, and health and retirement benefits, not on matters touching faith, morals or religious polity.
Defendants, in contrast, contend that Article I, paragraph 19 violates the First Amendment religion clauses if applied in this *378 case, transgressing the Establishment Clause, injecting government into religion, creating an entanglement of the two, and burdening free exercise rights.
The First Amendment states in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" These protections apply to the states. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The distinction between the two clauses is the presence of coercion, which need not be attendant for a violation of the Establishment Clause. Abington School District v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844, 858 (1963).
The United States Supreme Court uses, at least nominally, the now-familiar three-prong test for determining whether there has been a violation of the establishment clause: whether the challenged law or conduct has a secular purpose; whether its principal or primary effect is to advance or inhibit religion; and whether it creates an excessive entanglement of government with religion. Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971). See also Rosenberger v. University of Va., 515 U.S. ___, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); Capitol Sq. Rev. and Advisory Bd. v. Pinette, ___ U.S. ___, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Faced with an issue similar to the issue raised by this appeal, one court concluded that "the church-labor relations issues presented here are most appropriately analyzed under the free exercise clause" and that "the establishment clause challenge ... is actually a free exercise question." Hill-Murray Federation of Teachers v. Hill-Murray H.S., 487 N.W.2d 857, 863 (Minn. 1992). Another court has explicitly considered the two clauses jointly because of its belief that "there has been some blurring of sharply honed differentiations" between them. Catholic Bishop of Chicago v. NLRB, 559 F.2d 1112, 1131 (7th Cir.1977), aff'd on other grounds, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Or, as a third court presented with a similar scenario noted: "[T]he claims under the Establishment *379 Clause and the Free Exercise Clause involve the same considerations and are not easily divided and put into separate pigeon holes." Catholic High School Ass'n of Archdiocese of N.Y. v. Culvert, 753 F.2d 1161, 1166 (2d Cir.1985). Thus, for various reasons, courts have tended to analyze church-labor relations issues under both the establishment and the free exercise clauses. See, e.g., Culvert, supra, 753 F.2d at 1166 ("Nonetheless, for organizational purposes, we will discuss the clauses independently of each other").
We fail to see defendants' contention as an Establishment Clause claim. This is clearly a free exercise claim. This case does not involve government support for religion but rather government's claimed encroachment on religious exercise and observance. We agree with the academic view expressed by Professor Laycock:
Government support for religion is an element of every establishment claim, just as a burden or restriction on religion is an element of every free exercise claim. Regulation that burdens religion, enacted because of the government's general interest in regulation, is simply not establishment. Magic words like "entanglement" cannot make it so. Such regulation is properly challenged under the free exercise clause; courts that have analyzed the church labor relations cases in establishment clause terms have invoked the wrong provision. [Douglas Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1394 (1981) (footnote omitted).]
Accord Robert J. Pushaw, Jr., Note, Labor Relations Board Regulation of Parochial Schools: A Practical Free Exercise Accommodation, 97 Yale L.J. 135, 147 (1987) (footnotes omitted) ("Courts have weakened their First Amendment analyses by applying establishment clause rules prohibiting `entanglement'... to parochial school labor relations cases, which more properly turn on the free exercise issue of government `burdens' on religion resulting from enforcement of impartial regulatory laws").
We have great difficulty viewing the uniform application of a state constitutional provision to parochial schools as an establishment of religion. Rather, as Professor Pushaw points out, the parochial schools here are really requesting the benefit of a special *380 exemption from a neutral labor-relations law of constitutional dimension. Pushaw, supra, 97 Yale L.J. at 148. The issue should be analyzed solely under the Free Exercise Clause.

VI.
In Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 970 (1963), the Court held that any incidental burden on the free exercise of religion may be justified only by a compelling state interest in the regulation of a subject that is within the State's constitutional power to regulate. "[I]n this highly sensitive constitutional area, `[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 972 (quoting Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430, 440 (1945)). In Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court reiterated this test, and added:
But to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability....
A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for government neutrality if it unduly burdens the free exercise of religion.
[406 U.S. at 220, 92 S.Ct. at 1536, 32 L.Ed.2d at 28.]
When faced with such a claim, we must closely examine the interests the State seeks to promote and the impediments to those objectives that would flow from recognizing an exemption from a generally applicable law. Yoder, supra, 406 U.S. at 221, 92 S.Ct. at 1536, 32 L.Ed.2d at 28. The Sherbert/Yoder test is at bottom a balancing test requiring consideration of whether: (1) the claims presented were religious in nature and not secular; (2) the state action burdened the religious exercise; and (3) the state interest was sufficiently compelling to override the constitutional right of free exercise of religion. Culvert, supra, 753 F.2d at 1169.
*381 In Employment Div. v. Smith, 494 U.S. 872, 885, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876, 889 (1990), the Court discarded the Sherbert/Yoder approach to free exercise challenges. See Diaz v. Collins, 872 F. Supp. 353 (E.D.Tex. 1994) (recognizing abrogation of Yoder). In its place, the Court held that a generally applicable and otherwise valid regulatory law which is not specifically intended to regulate religious conduct or belief and which incidentally burdens the free exercise of religion does not violate the Free Exercise Clause of the First Amendment. 494 U.S. at 878, 110 S.Ct. at 1599-1600, 108 L.Ed.2d at 885. The Court retained the compelling interest test for instances where the regulatory law impacts the Free Exercise Clause in conjunction with another constitutional protection, such as freedom of speech and of the press, or the right of parents to direct the education of their children. 494 U.S. at 881-82, 110 S.Ct. at 1601-02, 108 L.Ed.2d at 887-88.
In response to the Smith decision, the Religious Freedom Restoration Act (RFRA), 42 U.S.C.A. § 2000bb, was adopted in November 1993. Its stated purpose was to restore the compelling interest test set forth in Sherbert and Yoder, and to guarantee its application in all cases where free exercise was substantially burdened by otherwise neutral laws. 42 U.S.C.A. § 2000bb(a) and (b). RFRA further provides in pertinent part:
(a) In general.  Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
(b) Exception.  Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person 
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.
[42 U.S.C.A. § 2000bb-1.]
RFRA is applicable to all federal and state law, whether statutory or otherwise, and whether adopted before or after the enactment of the Act. 42 U.S.C.A. § 2000b-3(a).
*382 The Fifth Circuit has recently declared RFRA constitutional in the face of a separation of powers challenge. Flores v. City of Boerne, 73 F.3d 1352 (5th Cir.1996). We agree with Judge Higginbottom's decision in Flores that RFRA was a valid exercise of Congress' power under Section 5 of the Fourteenth Amendment to enforce the provisions of that article, here the Due Process Clause. U.S. Const., Amend. XIV, § 5. There is "little room for doubt" that Congress intended to strengthen the rights guaranteed by the Free Exercise Clause of the First Amendment in adopting RFRA. Id. at 1358. See also Abordo v. Hawaii, 902 F. Supp. 1220 (D.Haw. 1995); Smith v. Fair Employment and Housing Commission, 12 Cal.4th 1143, 51 Cal. Rptr.2d 700, 913 P.2d 909 (1996) (divided court held that Free Exercise Clause and RFRA did not sanction religiously motivated rental housing discrimination against unmarried couples in violation of state law against discrimination). The Eighth Circuit recently avoided deciding the issue. Hamilton v. Schriro, 74 F.3d 1545 (8th Cir.1996). The Eleventh Circuit did likewise. Fawaad v. Jones, 81 F.3d 1084, 1087 n. 3 (11th Cir.1996).
Plaintiff claims that the proper test in this instance is not the Sherbert/Yoder test, as redefined or readopted by RFRA, but the Smith test, because the former test only applies when free exercise rights are substantially or unduly burdened, and, in this instance, Article I, paragraph 19 does not substantially burden defendants' free exercise rights. We consider this question largely a matter of semantics. As the Third Circuit has recently stated: "The `substantial burden' requirement was developed in the Supreme Court's free exercise jurisprudence, and codified in the Religious Freedom Restoration Act ... in order to balance the tension between religious rights and valid government goals advanced by `neutral and generally applicable laws' which create an incidental burden on religious exercise." Brown v. Borough of Mahaffey, 35 F.3d 846, 849 (3d Cir.1994). The confusion regarding "incidental" and "substantial" burdens was evident in cases interpreting Supreme Court jurisprudence prior to Smith. Thus, *383 the Fourth Circuit stated: "[C]ourts must distinguish incidental burdens on free exercise in the service of a compelling state interest from burdens where the `inroad on religious liberty' is too substantial to be permissible." Rayburn v. General Conf. of Seventh-day Adventists, 772 F.2d 1164, 1169 (4th Cir.1985), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). The Delaware Supreme Court, in analyzing Sherbert, noted:
[W]hile the Court in Sherbert thought the situation there demonstrated a "substantial infringement" of religious freedom, even an "incidental burden" on the free exercise of religion must be justified by a "compelling state interest." Once the individual demonstrates some Constitutional burden, whether substantial or incidental, direct or indirect, upon his free exercise of religion, the State must show a "substantial interest" sufficient to sustain its acts.
[Keegan v. University of Delaware, 349 A.2d 14, 17 (Del. 1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976).]
RFRA probably has not cleared up this confusion. In fact, an argument has been made that RFRA only exacerbated the confusion. See Arlin M. Adams, Recent Decisions by the United States Supreme Court Concerning the Jurisprudence of Religious Freedom, 62 U. Cin. L. Rev. 1581, 1595 (1994) (noting that one of RFRA's sponsors expressed the concern that the "substantial burdens" requirement added a tone of indefiniteness which could render the law void for vagueness). Apparently, under RFRA, the Smith analysis applies only if the burden on free exercise is insubstantial. Id. at 1593. Consequently, a court must make a threshold determination as to whether the burden on free exercise is substantial or incidental, in order to determine which level of scrutiny to apply. Id. at 1595. The discussion over the extent to which free exercise rights are burdened is perhaps somewhat academic. Regardless of whether the burden is substantial or incidental, there still must be a determination of whether the State's interest is compelling. As the Supreme Court has stated:
The mere fact that the petitioner's religious practice is burdened by a governmental program does not mean that an exemption accommodating his practice must be granted. The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.
[Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624, 634 (1981).]
*384 In addition, while defendants do not precisely denote the particular free exercise rights that will be infringed by application of Article I, paragraph 19 to them, there is no question that their concern is genuine and not feigned or speculative. As the United States Supreme Court has stated:
... [P]arochial schools constitute[] "an integral part of the religious mission of the Catholic Church." The various characteristics of the schools make them "a powerful vehicle for transmitting the Catholic faith to the next generation." This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly. In short, parochial schools involve substantial religious activity and purpose.
[Lemon, supra, 403 U.S. at 616, 91 S.Ct. at 2113, 29 L.Ed.2d at 757.]
Church-state relations also implicate the right of church autonomy. Thus, churches may object to modest or even minimal government regulation to avoid creating an adverse precedent that might support some greater, more objectionable regulation in the future. Laycock, supra, 81 Columbia L.Rev. at 1398-99. In light of these concerns, we turn to the relevant cases.
Two cases favor the union position. In Hill-Murray, supra, lay teachers of a religiously affiliated high school sought to be certified as an appropriate bargaining unit under Minnesota's Labor Relations Act (MLRA). 487 N.W.2d at 859. The mission of the high school was to provide "a well-rounded quality education in a Christian context." Ibid. The school was operated by a nonprofit corporation (the association) which leased the school premises from a church. Id. at 860. The association was comprised of fifteen individuals, two of whom were appointed by the Archbishop, and three of whom were appointed by the head of the local church. The teachers were required to support the Catholic Church with respect to faith, morals and specific doctrines. In addition, the Minnesota Supreme Court noted that the character and purpose of the school were intertwined with the Catholic religion; Catholicism was a pervasive influence at the school; and that while it was not possible to resolve whether secular education or sectarian education was the primary mission of the school, it was very clear that the religious aspect of the school was inseparable from its overall purpose. Id. at 864. The court analyzed the *385 association's claims under the holding in Smith and held that the application of the MLRA to labor relations at the school did not violate the Free Exercise Clause because "the right to free exercise of religion does not include the right to be free from neutral regulatory laws which regulate only secular activities within a church affiliated institution." Id. at 862-63. In the Establishment Clause context, the court held that because the level of state intervention was minimal, "[any] potential entanglement does not include the potential for the state to mandate religious beliefs nor does it contemplate that the MLRA will force the parties to agree to specific terms." Id. at 864. Thus, the court concluded:
The obligation imposed upon Hill-Murray by the application of the MLRA is the duty to bargain about hours, wages, and working conditions. We decline to categorize this minimal responsibility as excessive entanglement. Allowing lay teachers, almost all of whom are Catholic, to bargain collectively will not alter or impinge upon the religious character of the school. The first amendment wall of separation between church and state does not prohibit limited governmental regulation of purely secular aspects of a church school's operation.
[Ibid.]
In Catholic High School Ass'n v. Culvert, supra, a union representing lay teachers in eleven church-operated high schools under New York's State Labor Relations Act, which explicitly includes religious associations and corporations, filed charges with the State Labor Relations Board alleging unfair labor practices. 753 F.2d at 1163. The Board issued a complaint, and the union alleged that the Board's assertion of jurisdiction violated the First Amendment. Id. at 1164. In its free exercise analysis, the Second Circuit cited the fact that many matters pertaining to private schools, such as building and zoning regulations, fire inspections, teacher testing and compulsory school attendance laws, are already subject to governmental regulation. Id. at 1169-70. The court also pointed out that the association did not contend that collective bargaining is contrary to the beliefs of the Roman Catholic Church and that the Church has been among the staunchest supporters of the right of employees to organize and engage in collective bargaining. "[T]he Encyclicals and other *386 Papal Messages make clear that the Catholic Church has for nearly a century been among the staunchest supporters of the rights of employees to organize and engage in collective bargaining." Id. at 1170. Because the association failed to show that the Board's exercise of its power would have a coercive effect on its religious practices or be contrary to its beliefs, the court held that there was no burden on the association's free exercise rights. The court also held that any indirect and incidental burden on the association's free exercise rights was justified by a compelling state interest, namely, the fact that state labor laws are "essential to the preservation of industrial peace and a sound economic order," and that unions and employers have a duty to bargain collectively and in good faith. Id. at 1171.
Three cases have reached the opposite conclusion. In finding in favor of the schools in Catholic Bishop, supra, the Seventh Circuit held:
The Board's order to bargain unquestionably ... inhibits the bishops' authority to maintain parochial schools in accordance with ecclesiastical concern. If a bishop, for example, should refuse to renew all lay faculty teacher contracts because he believed that the union had adopted policies and practices at odds with the religious character of the institutions, or because he wanted to replace lay teachers with religious-order teachers who had become available, under ecclesiastical law he would have the right if not the duty to take that action. Yet, under the National Labor Relations Act, he might well be found guilty of an unfair labor practice.... The real difficulty is found in the chilling aspect that the requirement of bargaining will impose on the exercise of the bishops' control of the religious mission of the schools. To minimize friction between the Church and the Board, prudence will ultimately dictate that the bishop tailor his conduct and decisions to "steer far wider of the unlawful zone" of impermissible conduct.
[559 F.2d at 1123-24 (citations omitted).]
The court held that the case presented "not only ... sovereign involvement in the religious activity under the establishment clause but ... also curtailment of the free exercise of religion ..." Id. at 1131. As we have discussed, the United States Supreme Court affirmed on the statutory ground that the NLRB did not have jurisdiction over parochial high school labor relations. NLRB v. The Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).
*387 An older case, McCormick v. Hirsch, 460 F. Supp. 1337 (M.D.Pa. 1978), involved a challenge to the NLRB's attempt to exercise jurisdiction over a parochial high school which employed lay teachers seeking to organize. The court noted the possible conflict with the Free Exercise Clause due to the various powers of the NLRB. Id. at 1353. The court also noted that in separating the school into two discrete and possibly conflicting camps, lay and religious, "divisiveness between the lay and religious members seems inevitable." Ibid. The very determination of the appropriate unit would involve the NLRB in making a decision that concerns the internal structure of the church school, according to the court. Id. at 1354. The court concluded that the NLRB's interest in extending the NLRA into areas not considered by Congress was not a compelling interest sufficient to justify the intrusion upon the free exercise rights and religious liberties of the school. Id. at 1356. "[T]he harm to the [school], and the Catholic church as an Institution is so great and direct that an extraordinary showing of interest on the part of the NLRB would be needed to outweigh these interests." Ibid. The intrusion on religious liberty by the NLRB, with its extensive investigatory powers, would, according to the court, "require it to enter upon questions right at the heart of the religious mission of the church." Ibid.
In Caulfield v. Hirsch, 95 L.R.R.M. 3164, 1977 WL 15572 (E.D.Pa.), cert. denied, 436 U.S. 957, 98 S.Ct. 3071, 57 L.Ed.2d 1122 (1978) (related decision at 410 F. Supp. 618 (E.D.Pa. 1976)), the pastors of the Archdiocese of Philadelphia's elementary schools sought an injunction against the NLRB to prevent a representational election among the schools' lay teachers. In analyzing the free exercise question, the court focused on the fact that the NLRB has broad investigatory powers in a wide variety of circumstances that would focus on the internal affairs of the archdiocese. The court concluded:
[T]he special circumstances surrounding the religious mission of these parish schools, the relationships of lay teachers with their pastors, religious teachers, and fellow lay teachers, the inseparable intertwining of factors such as curriculum and *388 teacher discipline with the religious mission of the schools, and the pervasive authority of the NLRB over the employment area, persuade me that an interference with religious activity has occurred....
[1977 WL 15572, [*]14.]
The court also observed that the division of lay teachers from religious teachers, by placing the lay teachers in a separate bargaining unit, burdened free exercise by undermining the schools' belief in a "single undivided community of faith." Thus, the court held: "To governmentally compel the pastors or the Archdiocese to bargain with a union over ecclesiastical concerns would certainly ... constitute a constraint upon the free exercise of religion."
There are a number of distinguishing features between these cases and the case before us. For example, in Hill-Murray the school and its governing body were not pervasively religious and the case was decided while Smith was the applicable law. Culvert involved lay teachers in high schools, not elementary schools. While defendants make much of this distinction, we do not find it conclusive in their favor. In Tilton v. Richardson, 403 U.S. 672, 685-86, 91 S.Ct. 2091, 2099-2100, 29 L.Ed.2d 790, 803 (1971), the Court observed that there are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial and elementary schools, and that there was substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. However, we find no persuasive case law supporting defendants' attempted distinction between secondary and elementary schools on the grounds of the degree of religious indoctrination with respect to First Amendment analysis. However, unlike the Culvert court, 753 F.2d at 1169-70, we do not find significant for free exercise analysis the schools' duty to abide by other governmental regulations. As the Court of Appeals in Catholic Bishop, supra, stated: "Laws on matters such as fire inspections and compulsory attendance do not have the clear inhibiting potential upon the relationship between teachers and employers with *389 which the present [NLRB] Board order is directly concerned." 559 F.2d at 1124. See also McCormick, supra, 460 F. Supp. at 1356 ("Such matters such as police, fire and wage laws are simply of a different order than the interest the government offers here"). Nor do we think that defendants' concerns regarding the possible conflicts that will stem from union recognition are merely speculative or hypothetical. See Catholic Bishop, supra, 559 F.2d at 1126 (noting that the Church's concerns were not "speculative or fanciful" and that there does not have to be "an actual trial run" to determine whether there has been a violation of the First Amendment religion clauses); and Caulfield, supra, 1977 WL 15572 (noting that mere potential for interference with schools' right to freely exercise their religious belief is sufficient to invoke the protection of the First Amendment).
However, for purposes of the defendant's facial constitutional challenge on the New Jersey right to organize, we conclude that there is a compelling State interest which outweighs the claimed burden on defendants' free exercise rights. Article I, paragraph 19 is a fundamental State constitutional right guaranteed to private employees. Cooper, supra, 36 N.J. at 197, 175 A.2d 639. This constitutional provision "reaches beyond governmental action. It also protects employees against the acts of individuals who would abridge these rights." Id. at 196, 175 A.2d 639. In addition to the lay teachers' fundamental right guaranteed by the State Constitution is the fact, observed in Culvert, supra, 753 F.2d at 1171, that the State has a compelling interest in the "preservation of industrial peace and a sound economic order." Moreover, defendants' concerns over the infringement on their free exercise rights are alleviated to a great extent by the fact that New Jersey, unlike the NLRB and jurisdictions such as New York and Minnesota, does not have a labor board regulating private employees. Rather, any legal relief sought by plaintiff must come from the courts. The judiciary can avoid or prevent any undue interference in the ecclesiastical concerns of the schools through the application of "neutral principles" and insure that the "least *390 restrictive means" are employed in the bargaining relationship. 42 U.S.C.A. § 2000bb.
A longstanding principle of First Amendment jurisprudence forbids civil courts from deciding issues of religious doctrine or ecclesiastical polity. This prohibition does not apply to civil adjudication of purely secular legal questions. Elmora Hebrew Ctr., Inc. v. Fishman, 125 N.J. 404, 413, 593 A.2d 725 (1991). Courts can decide secular legal questions in cases involving some background issues of religious doctrine, so long as they do not intrude into the determination of the doctrinal issues. Id. at 414, 593 A.2d 725. In such cases, courts must confine their adjudications to their proper civil sphere by accepting the authority of a recognized religious body in resolving a particular doctrinal question, while, where appropriate, applying neutral principles of law to determine disputed questions which do not implicate religious doctrine. Ibid. "Neutral principles" are wholly secular legal rules whose application to religious parties does not entail theological or doctrinal evaluations. Id. at 414-15, 593 A.2d 725. Our Court in Fishman pointed to the example, at issue in that case, of an orthodox rabbi the scope of whose duties only a religious authority could decide, but whose contract, or non-religious condition of employment, a civil court could determine. Nonetheless, our Court has stressed that neutral principles "must always be circumscribed carefully to avoid courts' incursions into religious questions that would be impermissible under the first amendment," id. at 415, 593 A.2d 725, because "there are many cases in which court intervention is simply inappropriate because judicial scrutiny cannot help but violate the first amendment." Id. at 416, 593 A.2d 725.
Professor Laycock criticizes reliance on neutral principles in this context. In his view, such reliance ignores the church's resulting loss of autonomy and avoids the required in-depth constitutional analysis. In addition, Laycock is concerned that distinctions required by such an approach are difficult for secular courts, unversed in theological subtleties. Laycock, supra, 81 Colum. L. *391 Rev. at 1400, 1409 n. 270. A similar concern was voiced by the Court of Appeals in Catholic Bishop, supra:
We are unable to see how the Board can avoid becoming entangled in doctrinal matters if, for example, an unfair labor practice charge followed the dismissal of a teacher either for teaching a doctrine that has current favor with the public at large but is totally at odds with the tenets of the Roman Catholic faith, or for adopting a lifestyle acceptable to same, but contrary to Catholic moral teachings.
[559 F.2d at 1125.]
However, in spite of these concerns, we conclude that reliance on the doctrine of neutral principles will prove proper and efficacious. The concerns of secular intrusion expressed in Catholic Bishop are not nearly as substantial here because of the absence of a leviathan-like governmental regulatory board. Concern over a court's ability to make the necessary distinctions between the secular and the theological is, in our view, no obstacle given the anticipated nature of the collective bargaining process which we will discuss. As for the concerns regarding church autonomy: while these are legitimate, they are outweighed in this situation by the compelling governmental interest expressed in our State's constitutional provision guaranteeing the rights of working men and women.
In illustration, the scope of the extant collective bargaining agreement between the Diocese and plaintiff regarding the lay secondary or high school teachers carefully recognizes and preserves the Diocese's autonomy:
Recognition and Scope of Agreement
A. The organization is hereby recognized by the Diocese as the sole and exclusive collective bargaining agent for the following lay employees at diocesan sponsored secondary school:
1. All full-time classroom teachers;
2. All full-time guidance counselors;
3. All full-time nurses and librarians;
4. All full-time special education teachers within the diocese;
5. All long term substitutes; long term substitutes are defined as those hired to teach one semester or the equivalent of one semester in school days.

*392 6. All permanent part-time employees; permanent part-time employees are defined as those teaching or working the equivalent of an average of three classes per day.
7. Full-time positions shall not be filled with part-time employees. Excluding all others including:
1. All principals, all vice principals appointed by the Bishop of the Diocese, and all deans of students.
[a] In schools with enrollment over 500, these administrators shall teach no more than (2) periods per day.
[b] In schools with enrollment under 500, these administrators shall teach no more than three (3) periods per day.
4. All short term substitute teachers, clerical employees, custodial maintenance personnel, cafeteria employees and teacher aides.
B. The subjects covered by this Agreement are wages, benefits and other terms and conditions of employment.
C. Excluded from the scope of negotiations are the following:

1. Decisions involving educational policies and/or ecclesiastical considerations involving religious-moral qualifications.

2. The administrator's right to assign, supervise, discipline and demand responsible teacher accountability in all curricular and extra curricular areas.

3. The school ratio.
D. The parties hereto recognize that Sacred Heart High School, Wildwood Catholic High School and Gloucester Catholic High School are not diocesan sponsored, secondary school, but rather sponsored by their respective parishes. However, notwithstanding this difference of sponsorship, the Diocese is willing to continue their participation in high school collective negotiations in view of the past history of doing so. Nothing herein shall be construed to apply to any other situation.
E. The Organization declares that its aim is to provide a quality education for the students who attend the schools.
F. The Diocese and the Organization recognize the uniqueness of the Catholic school: established to provide education within the framework of Catholic principles, and that nothing in the agreement shall be considered as interfering in any way with the function and duties of the Diocese insofar as they are canonical or religious.

G. The Diocese and the Organization recognize the importance of employees giving witness to their faith.

H. The Organization recognizes the non-profit nature of the diocese and that it is a non-tax supported enterprise, primarily dependent upon tuition, and fees and voluntary offerings of the people, and that, accordingly, it is non-compatible to tax-supported enterprises.
I. The Organization recognizes the sole right and duty of the Bishop of the Diocese functioning through the Diocese to see that the schools are operated in *393 accordance with the philosophy of Catholic education, the doctrine, the teachings, the laws and norms of the Catholic Church.

J. The superintendent and the officers of the Organization shall meet on a regular basis at the request of either party.
K. The right to hire, suspend, discharge or otherwise discipline a teacher for violation of such rules or for other proper and just cause is reserved to the Diocese.

L. The diocese retains the sole right to operate the school system and nothing shall be deemed to limit or restrict it in any way in the exercise of all its functions in management operations. This includes the right to make such rules relating to its operation as it shall deem advisable providing they are not inconsistent with the terms of the agreement.
The agreement also contains a grievance procedure and a no-strike/no-lockout clause. It has a detailed salary scale and a schedule of various fringe benefits. The secondary school contract even contains a tenure provision not unlike the public-sector tenure provision which says:
ARTICLE III
Tenure
A. Tenure is defined as full-time employment by a degree holding employee for three (3) successive years and one (1) day. The calculation of tenure shall begin on the first paid day of employment.
B. An employee having tenure shall not be discharged except for reasons of serious and/or public immorality; insubordination, incompetency; serious neglect of duty or other just cause. Such discharge, when based upon incompetency shall be preceded by at least a ninety (90) calendar day period during which the employee shall have the opportunity to correct the areas of incompetency. The ninety (90) day period shall commence following a conference and a written evaluation of the employee detailing the areas of incompetency and the requirements to correct the same.
1. Employee may be otherwise disciplined for just cause which warrants disciplinary action, but falls short of cause for dismissal. This may include suspensions without pay.
C. Upon dismissal, the employee shall be presented with a written statement of the reasons for such action, which shall be subject to the grievance procedure, except as noted below:
1. Notwithstanding grievance and arbitration procedures hereinafter specified, any grievance arising from dismissal of a teacher for serious and/or public immorality and/or public rejection of official doctrine or teachings of the Church shall first be discussed orally with the principal. The charge shall then be reduced to writing and presented to the teacher. The teacher or Organization may then file a grievance at the Office of Superintendent level. If the grievance is not resolved *394 at the previous level, the teacher or the Organization may request arbitration by the Bishop of the Diocese, or his designee, whose decision shall be final and binding on all concerned.
There is nothing in the record to suggest that any ultimate agreement reached between the elementary school teachers and the Diocese will not also be as carefully circumscribed, or more so, to assure the religious autonomy of the schools and the Diocese. The agreements between the union and the schools in Culvert, supra, also were expressly limited to nonreligious issues. 753 F.2d at 1163. Indeed, the Diocese here admits that many elementary teachers presently have individual contracts and are not simply at-will hires. The Diocese's concern seems rooted in its objection to collective, not individual, bargaining.
Our Supreme Court's reasoning in the companion cases of Welter v. Seton Hall Univ., 128 N.J. 279, 608 A.2d 206 (1992), and Alicea v. New Brunswick Theological Seminary, 128 N.J. 303, 608 A.2d 218 (1992), demonstrate the realistic and wholesome restraints on our courts in this area. The Court noted in those cases that if an employee performs a ministerial function  those related to religious doctrine or pastoral activities, including teaching  then the First Amendment precludes judicial resolution of the employee's employment dispute or enforcement of an employment agreement. Welter, supra, 128 N.J. at 294-95, 608 A.2d 206. Thus, in the context of a breach of employment contract action, the Court observed:
... [W]hen the employee fulfills a ministerial function ... intrusion into the employment relationship directly affects the religion's formal doctrine. If the State may choose, or even limit the religious employer's options in choosing, those to whom it will entrust the propagation of the faith, the State effectively dictates the course of the religion.
[Id. at 295-96, 608 A.2d 206.]
The Court concluded:
When State action would impose restrictions on a religious institution's decisions regarding employees who perform ministerial functions under the employment relationship at issue, courts may not interfere in the employment relationship unless the agreement between the parties indicates that they have waived their free-exercise rights and unless the incidents of litigation  depositions, subpoenas, *395 document discovery and the like  would not unconstitutionally disrupt the administration of the religious institution.
[Alicea, supra, 128 N.J. at 312-13, 608 A.2d 218.]
Obviously, there is considerable difference between the individual employment disputes in Welter and Alicea and the collective bargaining sought in this case. The United States Supreme Court has noted the distinction between the two:
Collective bargaining between employer [sic] and . .. a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone.
[J.I. Case Co. v. National Labor Rel. Bd., 321 U.S. 332, 334, 64 S.Ct. 576, 579, 88 L.Ed. 762, 766 (1944).]
Moreover, our Supreme Court has recognized that "in assessing whether adjudication of intra-religious employment would transgress the First Amendment a court should first ascertain whether because of the ministerial role played by the employee, the doctrinal nature of the controversy, or the practical effect of applying neutral principles of law, the court should abstain from entertaining jurisdiction." Alicea, supra, 128 N.J. at 313, 608 A.2d 218. But "Only when the underlying dispute turns on doctrine or polity should courts abdicate their duty to enforce secular rights." Welter, supra, 128 N.J. at 293, 608 A.2d 206.
A recent example of judicial deference to religious polity in the employment area is found in Sabatino v. St. Aloysius Parish, 280 N.J. Super. 185, 654 A.2d 1033 (Law Div. 1994), aff'd, 288 N.J. Super. 233, 672 A.2d 217 (App.Div. 1996). We there affirmed the Law Division's dismissal of a claim by a former parochial elementary school principal, a lay person, where the Diocese wished to replace her with a nun because of the religious mission of the school. The plaintiff claimed breach of employment contract, gender discrimination and related torts. We abstained on First Amendment grounds recognizing that: "The principal is in charge of students' religious education; she supervises the teachers, plays a significant role in curriculum development, is liaison between the school and the religious community, and is the guiding force *396 behind the school's spiritual mission. Her functions are more than merely financial and logistic." Id. at 236, 672 A.2d 217. Because the principal of a parochial school performs a "ministerial" function, this court did not interfere with such an appointment or employment.
We stress that our ruling here recognizes that the defense to this action only involves defendants' facial attack on the State constitutional clause guaranteeing the right to organize and bargain collectively. We limit the scope of our decision to upholding the facial validity of Art. I., par. 19 in this context. We firmly endorse a general duty to bargain. We do not hold that there is a duty to bargain on any particular subject. We are ever mindful of the Court's advice in Welter v. Seton Hall University, 128 N.J. at 279, 608 A.2d 206, that: "We can conceive of no greater incursion into the exercise of religion than a limitation on the factors an institution may consider in deciding whether to hire or terminate an employee who is charged with propagating the religion or is functioning as an intermediary between the religions institution and its adherents." The threat of infringement will always be present. "Inevitably some of a lay teacher's responsibilities must hover on the imprecise border between religious and secular orientation." Catholic Bishop, supra, 559 F.2d at 1127.
However, given the nature of collective bargaining and the application of neutral principles, we are not persuaded that any infringement will rise to the level of impairment of defendants' free exercise rights. The State is not dictating any terms in resolving a particular contract dispute; the State is only requiring that defendants engage in collective bargaining. As the court in Culvert, supra, observed:
It is a fundamental tenet of the regulation of collective bargaining that government brings private parties to the bargaining table and then leaves them alone to work through their problems. The government cannot compel the parties to agree on specific terms. All it can do is order an employer who refuses to bargain in good faith to return and bargain on the mandatory bargaining subjects, all of which are secular.
[753 F.2d at 1167.]
*397 We are satisfied that adherence to historic principles will protect the teachers' right to organize and bargain without any substantial burdens on the schools' religious autonomy.

VII.
No New Jersey statute ever has been enacted to implement Article I, paragraph 19 with respect to private employers. Comite Organizador v. Molinelli, 114 N.J. 87, 96, 552 A.2d 1003 (1989). In the absence of such legislation, our Supreme Court has held that the constitutional provision is self-executing and that the courts, traditionally the proper forums for dealing with matters affecting labor relations, have both the power and the obligation to enforce rights and remedies under this constitutional provision. Ibid; Cooper, supra, 36 N.J. at 195, 175 A.2d 639; see Robert F. Williams, The New Jersey State Constitution: A Reference Guide 46-47 (1990). New Jersey courts have the power to enforce constitutional rights, including the right of persons in private employment to bargain collectively under Article I, paragraph 19. Lay Faculty Ass'n, supra, 122 N.J. Super. at 268, 300 A.2d 173; CWA v. Atlantic Cty. Ass'n for Retarded Citizens, 250 N.J. Super. 403, 410, 594 A.2d 1348 (Ch.Div. 1991).
In Johnson v. Christ Hospital, supra, the Chancery Division held that the rights granted under Article I, paragraph 19 impose upon employers an affirmative obligation to bargain collectively, 84 N.J. Super. at 553-56, 202 A.2d 874, and that enforcement of these rights includes the power of courts to require an employer to bargain collectively once its employees have effectively designated their collective bargaining representative. Id. at 558, 202 A.2d 874. "Until legislation is enacted ... courts must be equal to the task of formulating and effectuating a fair pattern of labor-management relations ... whatever the specific problem involved." Johnson v. Christ Hospital, 45 N.J. 108, 111 n. 1, 211 A.2d 376 (1965). The trial court can "exercise its vast equitable *398 powers [to] grant the relief which the circumstances dictate." Cooper, supra, 36 N.J. at 198, 175 A.2d 639. Mere lack of precedent does not stand as a bar to equitable relief necessary to achieve a just result. Fortugno v. Hudson Manure Co., 51 N.J. Super. 482, 501, 144 A.2d 207 (App.Div. 1958). Given the flexibility and adaptability of its jurisdiction, the Chancery court can tailor its relief in a manner which will not unduly impinge on defendants' free exercise rights, Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 411-12, 1 A.2d 425 (E. & A. 1938). See also Pepe v. Pepe, 258 N.J. Super. 157, 165, 609 A.2d 127 (Ch.Div. 1992) (Chancery court can narrowly tailor restrictions to the governmental interests served where First Amendment is implicated).
However, before ordering specific relief, the Chancery judge should have the full facts. Cooper, supra, 36 N.J. at 199, 175 A.2d 639. In Lay Fac. Ass'n, supra, there was a dispute over whether the association represented the majority it claimed. 122 N.J. Super. at 266, 300 A.2d 173. To resolve that dispute, the judge entered an order directing that a representational election be held. We instruct the Chancery judge on remand to resolve this dispute in a similar manner. If plaintiff receives the support of a majority of the lay teachers, then it should be considered as the teachers' bargaining representative, and defendants should be ordered to bargain collectively.
Reversed.
NOTES
[1] The "minimum standards" on the scope of negotiations were:

NOW, THEREFORE, the parties hereto mutually agree with each other as follows, if the lay teachers in a parish or regionalized elementary school should decide they want any organization to represent them:
(a) Any collective bargaining agreement shall not include priests or religious [sic] or affect in any way whatsoever any agreement between the parish or parishes and priests or religious [sic] or their community.
(b) In light of the unique nature of the Catholic elementary school, neither the courts nor any governmental labor relations board or similar entity shall be involved in any way whatsoever in the enforcement, interpretation or application of these minimum standards or any other agreement between the parties.
(c) The organization and the parish or parishes agree to the recognition and acceptance of:
(i) the Catholic elementary school as an institution involved primarily in the evangelization mission of the Church as such mission is carried on on the parish level, and
(ii) the special nature and mission of the Catholic elementary school which, in transmitting the Faith to those of an especially impressionable age, requires that Catholic teaching and moral standards be emphatically upheld at all levels of operation, and
(iii) the lay Catholic elementary school teacher, as a person who exercises a specific and privileged role within the Church by living the Catholic life in conformity with the teachings of the Church and by exercising his/her vocation within the community structure of the parish or regionalized school. The lay teacher also shares in the sanctifying mission of the Church. This involves a personal life witness where personal actions and public statements conform to the authentic teaching of the Church in all matters of faith and morals, and
(iv) the lay non-Catholic elementary school teacher, as a person who participates in a specific way in the overall mission of the Catholic school by respecting and upholding Catholic teaching, and by living a life of personal integrity. The non-Catholic lay teacher also shares, albeit in a qualified way, in the Church's efforts to fulfill its mission. Accordingly, this involves a personal life witness where public statements respect the teachings of the Church in matters of faith and morals.
(d) The directives and guidelines in the documents of the Second Vatican Council, the Sacred Congregation for Catholic Education, the National Conference of Catholic Bishops of the United States and the Camden Diocesan Synod of 1992 shall be incorporated by reference into any collective bargaining agreement entered into by the parish or parishes and the said organization and shall be binding on said organization.
(e) The parish or parishes shall retain the sole right and duty to operate the parish or regional Catholic school in accordance with the philosophy of Catholic education, the doctrines, laws and norms of the Catholic Church, and the statutes of the Diocese of Camden.
(f) The right to hire, suspend, discharge or otherwise discipline a teacher shall be reserved to the parish or parishes and nothing shall be deemed to limit or restrict in any way the parish's or parishes' exercise of its or their overall management function.
(g) Disputes shall be resolved at the level of the parish or regional parishes by the pastor or pastors involved. Any dispute relating to disciplinary action against a lay teacher that results in suspension or termination of employment shall, after a determination is made at the local level, be appealable to the Pastors' Appeal Board.
(h) The right of conscience of any lay teacher shall be respected regarding the individual's choice whether to join or pay a fee to the said organization.
(i) Any teacher who, by public action or statement contradicts or subverts in any way whatsoever the teachings of the Catholic Church or the policies of the Diocese of Camden shall be subject to immediate dismissal by the sponsoring parish or parishes. In those matters which concern the Church's Teaching, whether in faith, morals, or the stated policies of the diocese, the Bishop of Camden shall be the ultimate judge and his decisions are final.
(j) The matters addressed in these minimum standards, intended to protect and preserve the religious liberty of parish or regional parish schools, the integral relationship of the Catholic elementary school to the parish or parishes, and the right of lay teachers to select their appropriate representative, are excluded from the scope of any future negotiation between the parish or parishes and the organization chosen by the lay teachers to represent them.